624 So.2d 443 (1993)
STATE of Louisiana
v.
Michael HARRIS.
No. 92-KA-1838.
Court of Appeal of Louisiana, Fourth Circuit.
September 16, 1993.
*444 Harry F. Connick, Dist. Atty., Susan M. Erlanger, Asst. Dist. Atty., New Orleans, for appellee.
Margaret E. Fuller, Student Practitioner, Benita, Lobo, Student Practitioner, Darryl Derbigny, Supervising Atty., New Orleans, for appellant.
Before LOBRANO, WARD and ARMSTRONG, JJ.
LOBRANO, Judge.
Defendant, Michael Harris, was indicted for the second degree murder of Charles Davis, a violation of Louisiana Revised Statute 14:30.1.
Defendant was arraigned on May 10, 1988 and pled not guilty. On January 17, 1989, following a trial on the merits, defendant was found guilty as charged by a twelve member jury. On February 13, 1989, defendant was sentenced to life imprisonment without benefit of parole, probation or suspension of sentence. Based on an "errors patent" review, this Court affirmed defendant's conviction on June 28, 1990. On March 19, 1992 the Court granted defendant an out-of-time appeal.

FACTS:
At approximately 6:30 p.m. on February 17, 1988, New Orleans police officers were called to 4817 N. Miro street to investigate a shooting. Outside the residence they found Donald Burns, a/k/a Donlynn Burns, lying face down in a pool of blood. Burns had been shot in the head but was still alive. In his hand he was clutching a .25 caliber hand gun. A woman emerged from the residence crying that there was another victim inside. Inside apartment "A", the officers found the body of Charles Davis. Davis had been shot five times. His pockets had been turned inside out. Spent gun pellets and bullet strike marks were found in the bathroom, kitchen and living room. No guns were found in the apartment. Various pieces of jewelry were found on the step outside and in the alleyway. The officers also found a 1980 Renault automobile parked outside the building. Inside the car was a .38 caliber hand gun and bloodstains on the rear seat.
An autopsy of Charles Davis revealed that he sustained five gunshot wounds. Two were superficial. The rest pierced the lungs, heart and spinal cord. The location of the wounds indicated Davis had changed positions and that he was not standing upright when shot. The presence of gunpowder in the wounds indicated that the shots had been fired with the gun next to Davis' skin. It was stipulated that three bullets retrieved from Davis' body had not been fired from the gun found in the Renault. Samples taken from Davis' body tested positive for the presence of cocaine.
*445 The officers later learned that defendant, a suspect in the shootings, had been admitted to a nearby hospital with multiple gunshot wounds. When interviewed at the hospital, defendant told the officers that he had been walking down the street when two men drove up in a car, tried to rob him and shot him. Defendant was later arrested for Davis' murder.

TESTIMONY ADDUCED AT TRIAL:
Major Evans, occupant of the apartment where Davis was killed, testified that on the afternoon of the murder, Charles Davis, Davis' sister, Charlene Davis, Afrika Alexander, a fifteen year old boy named Donnel and a sixteen year old girl named Daphne were gathered in the apartment. Sometime during the afternoon, Betty Burns, Donald Burns' mother and defendant's girlfriend, knocked on the door. With the exception of Evans, the others in the apartment went into the bathroom. Betty Burns told Evans that she was looking for Davis because he had burglarized her daughter's apartment and stole $10,000.00. Evans told Burns that Davis was not in the apartment. Burns then left. However, shortly thereafter there was another knock at the door. When Evans opened the door he saw Donald Burns and two hooded men standing outside. All three were armed. Evans stated, "I was pulled out the door with three guns on me and told to get the hell away." Evans walked quickly to a friend's house. Shortly thereafter he heard gunshots.
Charlene Davis, the twenty-two year old sister of Charles Davis, testified that at the time of the murder she was living in Violet, Louisiana but was visiting her brother in New Orleans. She stated that prior to the shootings, she learned that her brother and another man had stolen a large sum of money and some cocaine from Betty Burns. She testified that on the afternoon of the shootings, she was at Evans's apartment with her brother. She stated that she and her brother and Donnel were in the bathroom when someone knocked on the door. She testified that Daphne and Ms. Alexander joined them in the bathroom "for safety" when they realized Burns was looking for Davis. She testified that they heard Burns tell Evans that if she could not find Davis "something would have to be done." Burns then left the apartment. Soon thereafter they heard another knock at the door. Daphne and Ms. Alexander then left the bathroom. Ms. Davis stated her brother then peeked out the bathroom door and told her and Donnel to leave the bathroom. She and Donnel ran out of the bathroom and hid under the kitchen table where they had a view of the hallway between the bedroom and bathroom. She testified that she saw defendant standing over her brother, heard defendant ask for money and then shoot her brother when he said he didn't have any money. She stated her brother was armed with a .38 caliber gun which was in the bag of money and cocaine stolen from Burns. She testified that defendant was accompanied by Donald Burns and another man. All three men then ran out of the apartment.
At trial Ms. Davis positively identified defendant as the man that stood over her brother and shot him. The defense introduced a statement she gave the night of the shooting wherein she stated that a "bright-skinned" guy, stood over her brother and shot him while defendant stood in the living room also shooting at her brother. She mentioned the presence of another man besides defendant and the "bright-skinned" man and said she only saw Donald Burns lying wounded outside after the shootings. When confronted with this statement, Ms. Davis insisted that she was upset when she gave the statement. She maintained that it was indeed defendant who stood over her brother and shot him. She stated that she could not remember what the "bright-skinned" guy looked like. Also, in the statement, Davis said she received $5,000.00 of the money and some cocaine to "keep quiet". She said she spent $100.00 of it and put the rest in a joint account in St. Bernard Parish under her brother's name. At trial, however, she denied receiving any of the money. She stated her cousin Sylvia had opened the account for her brother.
Afrika Alexander testified that she and Daphne had been sent on an errand by Davis the day of the shooting. While walking back to Evans' apartment, Donald Burns stopped *446 them, mentioned something about some jewelry and stated that he was going to Evans' apartment to get Davis. She stated they went to Evans' apartment to warn Davis who was in the bathroom with his sister and Donnel. She and Daphne joined them in the bathroom when they heard the knock on the door. She stated she heard Burns ask for Davis and then tell Evans that Davis had stolen money from her and that she was going to have to do something about it. After Burns left, she and Daphne exited the bathroom. At that point, Donald Burns, defendant and another man entered the apartment. Defendant pointed a gun at her and asked for Davis. Alexander then screamed. Defendant and the other man then walked back into the apartment while Burns stood at the door. As Alexander and Daphne ran from the apartment Burns pulled jewelry from Daphne's neck. Alexander testified that she heard gunshots before she ran from the apartment.
Sherry Hill, Evans' next door neighbor, testified that as she drove up to the building in her Renault, she observed Alexander and another girl running from the alleyway and she heard shots. As she turned her car around, she saw a man running out of the alleyway. The man then pointed something back into the alleyway and then she heard more shots. The man then came up to her car, threatened her with a gun and told her that he would not harm her or her child who was in the car if they let him into the car. She complied. He then insisted that she wait for another man who then ran up to the car and also got inside. They then forced her to drive them to another location. She identified her car as the car from which the officers later seized the .38 caliber gun.
Donald Burns testified that only he and a man he knew only as "Dray Dog" planned to go to Evans' apartment to confront Davis about the stolen money. On the way to the apartment, they ran into defendant who jointed them. Burns insisted, however, that while he and Dray Dog were armed, Harris had no weapon. Burns testified that as the trio entered Evans' apartment, Davis came out of the bathroom and began shooting. Burns stated that neither he, defendant or Dray Dog got any further than the door when Davis began shooting. He testified that he was at the door trying to retrieve some jewelry from Daphne that he had given her in the past. He testified that Davis shot defendant who then ran from the apartment. He insisted Dray Dog shot Davis. He also insisted that Charlene Davis shot him in the head. He admitted being in L.T.I. at the time of trial for possession of cocaine and the illegal possession of a weapon. He insisted the money stolen from his mother was money she saved from her job as a barmaid.
Defendant testified in his own behalf. He stated that he was walking to Evans' apartment alone to talk to Davis' about the money. He denied being armed or that he intended to kill Davis. He stated that on the way to the apartment, he met Burns and Dray Dog who then followed him to the apartment. He stated that when Evans opened the door, Davis began shooting. He was shot four times while he and Davis struggled over Davis' gun. Davis shot him a fifth time while he was running away. He testified that he ran into a passageway between the kitchen and the living room, picked up a gun, and shot at Davis. He stated, however, that he did not hit him. He then ran from the apartment as another man ran inside. As he ran from the building, a man grabbed him and pulled him into Ms. Hill's car. Another man then got into the car. Ms. Hill then drove him to his sister's house. Ms. Burns eventually found him and took him to the hospital. He stated he lied about how he sustained his wounds because he was afraid. He admitted to prior convictions for possession of valium, simple burglary and possession of marijuana.
Defendant appeals his conviction and sentence asserting the following assignments of error:
1) There was insufficient evidence to support the jury's verdict;
2) Trial counsel was ineffective for failing to object to an erroneous jury instruction;
3) The court's instruction to the jury on reasonable doubt violated defendant's due process rights under Cage v. Louisiana;

*447 4) A jury instruction which is erroneous under Cage v. Louisiana cannot be deemed to be harmless error.

ASSIGNMENT OF ERROR 1:
Defendant asserts the State failed to present sufficient evidence to sustain a conviction for second degree murder beyond a reasonable doubt. Specifically, defendant argues the State failed to prove that he was the perpetrator of the murder because the bullets removed from Davis' body had not been fired from the gun found in Ms. Hill's car. He asserts that since the gun he fired was the one found in Hill's car, he could not have killed Davis. We disagree.
The standard for reviewing a claim of insufficient evidence is whether, after viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Jacobs, 504 So.2d 817 (La.1987); State v. Fuller, 414 So.2d 306 (La.1982).
Nevertheless, the reviewing court may not disregard its duty to consider whether the evidence is constitutionally sufficient simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305 (La.1988). The reviewing court is not permitted to consider just the evidence most favorable to the prosecution but must consider the record as a whole since that is what a rational trier of fact would do. Mussall, supra. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier's view of all the evidence most favorable to the prosecution must be adopted. Mussall, supra. The fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Mussall, supra.
Defendant was charged and convicted of second degree murder which is defined, in pertinent part, as:
"The killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm." La.R.S. 14:30.1.
The record shows that defendant was not the only person who got into the back seat of Ms. Hill's car. Hill and defendant testified that at least one other man was in the car. In addition, there was only the defendant's testimony that the gun found in Hill's car was the gun he fired.
Davis was shot five times. Charlene Davis, Afrika Alexander and Donald Burns, as well as defendant, place defendant at the scene of the murder. Ms. Davis insisted that it was defendant who stood over her brother and shot him. Also, the location of the wound and the presence of gunpowder show the shooting could not have occurred the way Burns testified it happened.
Obviously, the jury chose to believe Charlene Davis' testimony that defendant stood over her brother and shot him. The trier of fact has great discretion in its determination of the credibility of witnesses and such determination should not be disturbed unless such finding is clearly contrary to the evidence. State v. Cashen, 544 So.2d 1268 (La.App. 4th Cir.1989).
Thus, given the evidence presented at trial, any rational trier of fact could have found defendant guilty beyond a reasonable doubt.
This assignment of error is without merit.

ASSIGNMENTS OF ERROR 2, 3 AND 4:
Defendant asserts his trial counsel was ineffective for failing to object to a constitutionally deficient jury instruction as per Cage v. Louisiana, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990) and, as such, was not harmless error.
The jury instruction given in Cage contained language equating a finding beyond a reasonable doubt with a "moral certainty", "grave uncertainty" and "actual substantial doubt". The court found that these terms could have suggested "a higher degree of doubt than is required for acquittal" and, as such, could have led a jury to interpret the instruction "to allow a finding of guilt based upon a degree of proof below that required by the Due Process Clause." Cage, at pps. 39-41, 111 S.Ct. at pps. 329-330. The instruction *448 in the instant case only contained the phrase "grave uncertainty". However, in State v. Harrison, 609 So.2d 789 (La.1992) our Supreme Court held that under the circumstances of that particular case, even the inclusion of only the phrase "grave uncertainty" in the definition of reasonable doubt was erroneous and was not harmless error.
The transcript of the jury instructions indicates that no objection was made to the reasonable doubt jury charge. Defendant acknowledges this fact but asserts his trial counsel was ineffective for failing to object.[1]
The two-tiered test to be used to determine whether counsel was ineffective was set forth in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In order to substantiate a claim of ineffective assistance of counsel, a defendant must show that counsel's performance was deficient and that deficiency prejudiced the defendant. Assuming arguendo that counsel's failure to object to the jury instruction meets the first prong of the Strickland test, for the following reasons we conclude the error on counsel's part was harmless.
In Sullivan v. Louisiana, ___ U.S. ___, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993) the U.S. Supreme Court held that an erroneous Cage instruction constituted a "structural defect in the constitution of the trial mechanism" and is not subject to a harmless error analysis. That decision raises the Cage error to constitutional proportions by concluding that "there has been no jury verdict within the meaning of the Sixth Amendment." In the instant case we nevertheless conclude that use of the term "grave uncertainty", although erroneous, does not rise to the Sullivan constitutional proportions.
In State v. Harrison, supra, the Louisiana Supreme Court equated the "grave uncertainty" error with the Cage error only within the context of the factual circumstances of that particular case.
The jury instruction in the instant case, i.e. "grave uncertainty" although erroneous, does not, in our opinion, rise to the Constitutional proportions defined in Sullivan. In State v. Harrison, supra, the Louisiana Supreme Court spoke of the error in using "grave uncertainty" in the context of the factual circumstances of that particular case. There, the evidence was fairly balanced between the victim's account and that of the defendant. There were no eyewitnesses. Thus the Court reasoned that defining reasonable doubt with the phrase "grave uncertainty" did influence the jury verdict and could not be described as harmless. However, we do not interpret Harrison to mean that in every instance where only the phrase "grave uncertainty" is used in a jury instruction, a Sixth Amendment error exists.
In the instant case, the evidence satisfies us that the error in using "grave uncertainty" does not rise to the constitutional proportions expounded in Sullivan and is subject to a harmless error analysis. Based on the facts and circumstances of this case, we find that any error in the jury instructions did not unduly influence the jury verdict and did not deprive defendant of his Sixth Amendment right to a jury trial.
CONVICTION AND SENTENCE AFFIRMED.
NOTES
[1] We pretermit any discussion of State v. Dobson, 578 So.2d 533 (La.App. 4th Cir.1991), writ denied 588 So.2d 1110 (La.1991) because its holding is under review by this Court at the present time.