746 So.2d 643 (1999)
STATE of Louisiana
v.
Patrick BROWN.
No. 97-KA-2260.
Court of Appeal of Louisiana, Fourth Circuit.
October 6, 1999.
*644 Yvonne Chalker, Louisiana Appellate Project, New Orleans, Louisiana, Attorney for Defendant/Appellant, Patrick Brown.
Harry F. Connick, District Attorney, Susan Erlanger Talbot, Assistant District Attorney, New Orleans, Louisiana, Attorneys for Appellee/the State of Louisiana.
Court composed of Chief Judge ROBERT J. KLEES, Judge PATRICIA RIVET MURRAY and Judge JAMES F. McKAY, III.
MURRAY, Judge.
Patrick Brown was convicted by a twelve-person jury in December 1994 of the aggravated rape of his girlfriend's six-year-old daughter, a violation of La. R.S. 14:42 A(4), and was sentenced to life imprisonment. He now appeals both his conviction and sentence. We affirm.

FACTS
On Ash Wednesday 1994, six-year-old L.B. was at the home of her maternal grandmother, Patricia, who generally kept the child during the school week.[1] Because of the child's complaints, Patricia noticed that her granddaughter's "bottom was raw." Attributing this condition to L.B.'s all-day exertions on Mardi Gras and the fact that the child had not bathed before going to bed Tuesday night, Patricia now bathed her and applied some diaper rash medicine to the affected areas. When Patricia went to pick up L.B. after school on Thursday, she learned that the child had cried most of the day and appeared to be in pain, "like she had a stomachache." L.B. was given her dinner and some Pepto Bismol, then sent to bed. Patricia phoned the child's mother, Cathy, and told her that L.B. needed to go to the doctor's.
The next day, Friday, Cathy went to Patricia's and saw that L.B. had a yellowish-green vaginal discharge. She took her daughter to Charity Hospital where she was given some Lotrimin lotion and told to return on Monday.[2] As usual, the child spent the weekend with her younger siblings in Cathy's household, which at that time included three men: Cathy's boyfriend, Patrick Brown (the defendant); her father, Lawrence; and her cousin, Lamar.
*645 Because Cathy had another appointment that morning, L.B. was brought back to the Charity Hospital pediatric emergency room by her maternal great-aunt, Carolyn, on Monday, February 21, 1994. The nurse noted in the medical records that the child was there for "followup for vaginal discharge," and a pediatric resident, Dr. Ronald D. Wilcox, did a general physical examination. Based upon a visual inspection of the discharge, Dr. Wilcox suspected that L.B. had a sexually transmitted disease (STD), probably gonorrhea or chlamydia. He sent for Dr. Maria Mena, a board-certified pediatrician assigned to the hospital's Child Sexual Abuse Clinic, before proceeding any further. While they waited, Carolyn phoned Patricia and summoned her to the hospital.
Upon arrival, Dr. Mena agreed that it appeared this young child had an STD, indicating that an assessment for possible sexual abuse was necessary. After a preliminary discussion to reassure L.B. that she was safe and could talk freely, the doctors asked if "anyone ever touched her down there in a way that made her feel uncomfortable or that hurt her?" The child initially said no, but after further assurances from the doctors, L.B. began to cry and said "My daddy, Patrick, stuck his penis in me down there," pointing to her genitals. Dr. Wilcox immediately recorded her statement in his notes, using quotation marks to indicate he had written "exactly what she said."[3] The doctor testified at trial that this information was necessary for the diagnosis and treatment of L.B.'s vaginal discharge.
Through further questioning, additional details of Mr. Brown's alleged sexual attack were obtained and documented on a six-page Sexual Abuse Examination Form. A complete pelvic exam revealed evidence of vaginal penetration occurring "a couple of weeks" earlier, which was consistent with L.B.'s account. The physical findings were recorded in the child's medical records as well as on the separate Sexual Abuse Form, and photographs of L.B.'s vaginal area were made using a culposcope that magnified the images. Swabbed samples from the child's cervix and rectum were later confirmed positive for the bacteria that causes gonorrhea, which has an average incubation period of two to seven days.
After the medical examination, two detectives assigned to the New Orleans Police Department's child abuse unit spoke with L.B., with no family members present. They then interviewed Patricia. When Cathy and the defendant arrived at the hospital, the officers gave them a brief explanation of the situation and advised Mr. Brown of his rights. Both Cathy and Mr. Brown voluntarily accompanied the detectives to police headquarters for further questioning. After executing a formal waiver of his rights, Mr. Brown denied any inappropriate behavior with L.B. or any of Cathy's children, explaining that he was rarely left alone with them. Despite Mr. Brown's denial, he was arrested immediately, based upon the medical evidence and the child's statements. Child Services removed L.B. from Cathy's custody and placed her in her great-aunt Carolyn's home.
Cathy was shocked and enraged by what had been done to her daughter, but she believed Mr. Brown when he denied any wrongdoing. She accused both her cousin and father of molesting L.B., prompting both men to seek STD testing at a local clinic. Results dated February 24 1994 for Lamar, the cousin, revealed he had a yeast infection but not gonorrhea. L.B.'s grandfather, Lawrence, was tested February 28, 1994, with a negative report. It was stipulated at trial that when Patrick Brown was tested on March 25, 1994, the results indicated that he "previously had a gonorrhea infection."
*646 There was no testimony or evidence at trial suggesting that sexual abuse had been suspected, much less discussed, by anyone in L.B.'s family prior to the second visit to the pediatric emergency room. Although Carolyn had remained with L.B. throughout the doctors' examination on February 21st, and Patricia had joined them in the examining room at some point, Dr. Wilcox explicitly testified that no one in the room had mentioned the name "Patrick" or "Patrick Brown," or even used the word "penis," prior to the child's statement regarding what had been done to her. In addition, the doctor denied having used leading questions.
It was explained at trial that Carolyn had been L.B.'s primary caregiver until the child was about four years old. Carolyn testified that when L.B. was about a year old, she began asking questions about the difference between boys and girls. Carolyn responded by showing the child pictures and teaching her the words "penis" and "vagina" as well as more common terms she might hear on the street.
Cathy was called to testify at trial for both the prosecution and the defense. She confirmed that L.B. had been raised, for the most part, by both Patricia and Carolyn, and that the child sometimes used the name "daddy" to refer to their boyfriends as well as to her grandfather, Lawrence. While L.B. also called Patrick Brown "daddy," Cathy had never heard her call him "Daddy Patrick." Cathy testified that in early 1993, both she and the defendant had contracted gonorrhea and that she had had a discharge at that time that was similar to L.B.'s. She also explained that she had initially accused her father of abusing L.B. because sometimes he would get drunk and fall asleep on the living room floor, but in the morning he would be "in the bed next to my children." Although she had sent Mr. Brown a letter expressing her love and support in April 1994, by the time of the December 1994 trial she no longer believed in his innocence.
L.B., who had attained age seven by the time of trial, was called to the witness stand twice during the trial. Although she was able to answer preliminary questions regarding her competency from counsel and the court, once the jury was brought in she began to cry and her nose began to bleed. The child was removed, and the judge cautioned the jurors that they were not to be "distracted" by the incident nor influenced by sympathy or passion. After an off-the-record discussion between counsel and the court, the judge stated that, "side bar is denied."[4]
L.B. was then re-called to the stand and the prosecutor was able to elicit information concerning her age, family, address, and school. However, after demonstrating that she knew the difference between the truth and a lie, L.B. was unable to respond to questions regarding the consequences of telling a lie. When her nose began to bleed again, she was removed from the courtroom and another witness was called. Although the State later asked to re-call L.B., the court ruled that because the child's composure appeared no better than earlier, it was not going to risk the potential prejudice of further "dramatics."
Despite defense counsel's attacks on the testimony and evidence in his closing argument, the jury found Mr. Brown guilty of the aggravated rape of L.B.

ASSIGNMENTS OF ERROR

SUFFICIENCY OF THE EVIDENCE
Although it is conceded that there was substantial medical evidence to establish that L.B. had been raped, Mr. Brown contends that the evidence was insufficient to support the jury's verdict that he was her attacker. He argues that even if Dr. Wilcox's hearsay testimony was properly admitted,[5] *647 he is entitled to an acquittal under Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
The standard for appellate review of a claim of insufficient evidence is firmly established in Louisiana law:
An appellate court reviewing a claim of insufficient evidence must determine that the trial evidence, whether direct or circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt. The elements must be sufficient that every reasonable hypothesis of innocence is excluded.... If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier's view of all the evidence most favorable to the prosecution must be upheld. However, if the appellate court finds that no rational trier of fact, viewing all the evidence from a pro-prosecution standpoint, could have found guilt beyond a reasonable doubt, the conviction cannot constitutionally stand.
State v. Hawkins, 96-0766, p. 7 (La.1/14/97), 688 So.2d 473, 479 (citations omitted). When the defendant's identity as the perpetrator is at issue, Jackson v. Virginia, supra, requires the State "to negate any reasonable probability of misidentification." State v. Smith, 430 So.2d 31, 45 (La.1983). In reviewing the record to determine sufficiency of the evidence, a jury's credibility decisions should not be disturbed unless clearly contrary to the evidence. State v. Harris, 624 So.2d 443, 447 (La.App. 4th Cir.1993), writ denied, 93-2609 (La.6/24/94), 640 So.2d 1339.
Mr. Brown argues that L.B.'s father and cousin were also living in the household with L.B. at this time, and that only their testimony, rather than medical reports, were presented to establish that they both tested negative for gonorrhea shortly after the rape was discovered. He emphasizes that Dr. Wilcox recorded L.B.'s statement as identifying "my daddy Patrick" as her attacker, even though no one had heard her call Mr. Brown "Daddy Patrick" before. Instead, it was shown that the child called several men "daddy," including her grandfather and cousin. Mr. Brown contends that with this evidence of L.B.'s "extremely dysfunctional family situation" and the circumstances under which she was living, reasonable doubt as to the identity of the rapist remains.
However, viewing the totality of the evidence in the light most favorable to the State, we find the proof sufficient to convince a rational factfinder, beyond a reasonable doubt, that Mr. Brown committed the rape of L.B., a child under age twelve. The medical testimony established that her hymen had been damaged and enlarged by vaginal penetration, probably by a penis, and her vaginal discharge was confirmed to be a symptom of gonorrhea, which is transmitted by sexual contact. It was stipulated that a test performed one month after L.B.'s diagnosis, and approximately six weeks after the rape, established that Mr. Brown had previously been infected with the same disease. In addition, the child explicitly identified the defendant as the rapist, saying that he had "stuck his penis in me down there" two weeks earlier, a date that was consistent with the medical findings. The contradictory evidence noted above was put before the jury and rejected, despite the emphasis given to it in defense counsel's closing arguments. Accordingly, the evidence presented satisfies the Jackson v. Virginia standard.

ADMISSIBILITY OF HEARSAY
Mr. Brown asserts that the trial court erred in admitting Dr. Wilcox's testimony as to L.B.'s identification under Evidence Code article 803(4), a hearsay exception *648 for statements made for certain medical purposes. He argues that the circumstances under which the statement was made do not support the inference of reliability necessary for the admission of hearsay, and that his conviction thus must be reversed.
As our Supreme Court recently noted in Folse v. Folse, 98-1976, p. 19 (La.6/29/99), 738 So.2d 1040, decisions regarding the admissibility of hearsay testimony are to be made on a case-by-case basis, keeping in mind that "it is clear that the legislature has expressed an overriding interest in protecting child victims of sexual abuse by encouraging the admission of reliable hearsay evidence for the trial court to weigh."[6] Additionally, such rulings on the admissibility of evidence will not be overturned absent a clear abuse of discretion. State v. Richardson, 97-1995 (La.App. 4th Cir.3/3/99), 729 So.2d 114; State v. Mosby, 595 So.2d 1135, 1139 (La. 1992).
Article 803 of the Code of Evidence provides in pertinent part:
The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
* * * * *
(4) Statements for purposes of medical treatment and medical diagnosis in connection with treatment. Statements made for purposes of medical treatment and medical diagnosis in connection with treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to treatment or diagnosis in connection with treatment.
In the redactors' comments to this provision, it is noted that Louisiana's exception "follows Federal Rule of Evidence 803(4) but .... excludes from its coverage statements made solely for the purpose of diagnosis." The comments also indicate that the statutory language has been interpreted to limit the scope of the exception to the kind of statements that are usually relied upon by doctors in their diagnosis and treatment of patients. As further explained in Morgan v. Foretich, 846 F.2d 941, 949 (4th Cir.1988), the patient's motivation to ensure that proper treatment is based upon complete and accurate information provides such statements with substantial guarantees of trustworthiness.
Mr. Brown acknowledges that a statement identifying the perpetrator of sexual abuse, especially when a communicable STD is suspected, is reasonably pertinent to obtaining proper medical treatment and thus has generally been held admissible under the federal counterpart of this exception, as in Foretich, supra. He argues, however, that in this case it cannot be inferred that L.B. was motivated to respond truthfully to the doctors' questions. Mr. Brown asserts that there was no evidence that this six-year-old child understood the purpose of the questions, and notes that L.B. initially denied that anything had happened. He further maintains that because she made her statement only after several minutes of "continued prodding" by her grandmother and great-aunt, the two adults who had raised her, her identification was likely motivated by her desire not to displease them by remaining silent or naming someone else in the household.[7]
In support of this argument, Mr. Brown cites Cassidy v. Maryland, 74 Md.App. 1, 536 A.2d 666, review refused, 312 Md. 602, 541 A.2d 965 (1988), in which it was held that a young child's statement to a doctor, *649 identifying her mother's boyfriend as the person who had physically abused her three days earlier, was not admissible under that state's counterpart to our medical treatment hearsay exception. The Cassidy court based this ruling in part upon the fact that there was no indication that the two-year-old victim understood why she was being questioned.
Mr. Brown's reliance on Cassidy is misplaced. As the same Maryland court emphasized only nine months later in In re Rachel T., 77 Md.App. 20, 549 A.2d 27, 34 (1988), there can be "a vast difference between the cognitive development of a two-year old" and that of a child only a few years older.[8] In the instant case, L.B. was six years old at the time of her examination, and she was described at trial as "bright and articulate." Absent any indication of a mental defect, it is reasonable to infer that a child of six understands the purpose of a medical examination and the doctor's accompanying questions. Furthermore, it was apparent that L.B. had been suffering for several days from an unexplained vaginal discharge, providing a connection, obvious even to a six-year-old, to the doctors' queries about touches "down there." Therefore, we reject Mr. Brown's challenge to admissibility based upon L.B.'s age or her alleged lack of understanding.
Similarly, we find no basis for Mr. Brown's contention that the identification was inadmissible based upon the circumstances or setting in which L.B.'s statement was made. His claims that Patricia and/or Carolyn influenced the child, either before or during the doctors' questioning, were explored during defense counsel's cross examinations of the witnesses. However, there was no testimony indicating that anyone in the family had mentioned the possibility of sexual abuse to L.B., much less suggested that a particular individual might be the perpetrator. Thus, while Mr. Brown's attorney was permitted to argue in closing that L.B.'s use of the word "penis," as well as the unfamiliar name, "Daddy Patrick," could mean that the child had been "coached," the minimal evidence supporting this contention is insufficient to establish that L.B.'s statement was inadmissible.
Under these facts, we find no error or abuse of discretion in the trial court's determination that Dr. Wilcox's testimony relating L.B.'s statement was admissible under Evidence Code article 803(4), the medical treatment exception to the hearsay rule.

THE CONFRONTATION CLAUSE
Mr. Brown argues that L.B.'s failure to testify violated his right to confront and cross examine his accuser, as guaranteed by the Sixth Amendment to the U.S. Constitution and Article 1, § 16 of the Louisiana Constitution. He asserts that the legislature has acknowledged the importance of this right in child abuse cases by providing, in R.S. 15:283, for the use of closed circuit television under certain circumstances.
The U.S. Supreme Court has repeatedly recognized that although the literal language of the Confrontation Clause provides for face-to-face accusation at trial, this provision does not represent an absolute bar to the use of hearsay testimony. Ohio v. Roberts, 448 U.S. 56, 63, 100 S.Ct. 2531, 2537, 65 L.Ed.2d 597 (1980). The Court has specified instead that if an out-of-court declarant is unavailable to testify,
[H]is statement is admissible only if it bears adequate `indicia of reliability.' Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, *650 at least absent a showing of particularized guarantees of trustworthiness.
Id. at 66, 100 S.Ct. at 2539 (footnote omitted). Our state supreme court has acknowledged this interplay between the Confrontation Clause and the restrictions on the use of hearsay evidence, noting that both serve to promote reliability and accuracy in the fact-finding process. State v. Langley, 95-1489, p. 12 (La.4/14/98), 711 So.2d 651, 662 (reh'g granted in part on other grounds).
The tension between the Confrontation Clause and the admission of hearsay testimony was considered under circumstances remarkably similar to those presented here. In White v. Illinois, 502 U.S. 346, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992), the four-year-old victim of a sexual assault was twice called as a witness at trial, but became too emotional to provide any substantive testimony. However, the trial court ruled that the child's statements during a medical examination approximately four hours after the attack were admissible under both the spontaneous declaration exception and that state's medical treatment exception to the hearsay rule.[9] The Supreme Court rejected the defendant's claim that his right to confrontation had been violated:
We note first that the evidentiary rationale for permitting hearsay testimony regarding spontaneous declarations and statements made in the course of receiving medical care is that such out-of-court declarations are made in contexts that provide substantial guarantees of their trustworthiness. But those same factors that contribute to the statements' reliability cannot be recaptured even by later in-court testimony. A statement that has been offered in a moment of excitementwithout the opportunity to reflect on the consequences of one's exclamation may justifiably carry more weight with a trier of fact than a similar statement offered in the relative calm of the courtroom. Similarly, a statement made in the course of procuring medical services, where the declarant knows that a false statement may cause misdiagnosis or mistreatment, carries special guarantees of credibility that a trier of fact may not think replicated by courtroom testimony....
* * * * *
We therefore think it clear that the out-of-court statements admitted in this case had substantial probative value, value that could not be duplicated simply by the declarant later testifying in court. To exclude such probative statements under the strictures of the Confrontation Clause would be the height of wrongheadedness, given that the Confrontation Clause has as a basic purpose the promotion of the "integrity of the factfinding process." And as we have also noted, a statement that qualifies for admission under a "firmly rooted" hearsay exception is so trustworthy that adversarial testing can be expected to add little to its reliability.... We therefore see no basis in [prior cases] for excluding from trial, under the aegis of the Confrontation Clause, evidence embraced within such exceptions to the hearsay rule as those for spontaneous declarations and statements made for medical treatment.
Id. at 355-57, 112 S.Ct. at 742-43 (citations and footnote omitted).
Both the facts and arguments presented in the instant case are indistinguishable *651 from those presented to the U.S. Supreme Court in White v. Illinois. Under these circumstances, Mr. Brown's right to confrontation was not violated by L.B.'s failure to testify.

PREJUDICE RESULTING FROM L.B.'S APPEARANCES AT TRIAL
Mr. Brown claims that the sympathy invoked by L.B.'s emotional reaction and nosebleed when she attempted to testify, combined with the evidence that she had been raped by someone, inflamed the jury to return a guilty verdict despite the questionable hearsay identification. He contends that because the child's two appearances prejudiced him before the jury, a mistrial should have been ordered.
While Mr. Brown has failed to specify the statute under which a mistrial should have been granted, Article 775 of the Code of Criminal Procedure provides in part:
Upon motion of a defendant, a mistrial shall be ordered, and in a jury case the jury dismissed, when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial.
It has long been held that the trial court has broad discretion in ruling on a motion for a mistrial under this Article, and that such a motion should be granted only where prejudicial remarks of a witness make it impossible for the defendant to obtain a fair trial. State v. Smith, 418 So.2d 515 (La.1982). Because mistrial is a drastic remedy, it is not appropriate if an admonishment can cure the alleged error. State v. Goods, 403 So.2d 1205 (La.1981).
When L.B. made her first attempt to testify and suffered a nosebleed, the trial court carefully admonished the jury:
Ladies and gentlemen of the jury, let me remind you, you know that you are dealing with minor witnesses. [During voir dire] I gave you a special instruction on judging the credibility of a child witness. I would like to reiterate that instruction to you.... We refer to that as demeanor. That should be judged should be evaluated in light of what the conduct of other children of similar age and intelligence would be under like circumstances. I charge you further that the statements of a child witness are not to be considered as you would statements of a matured person.... I told you earlier that you, as jurors, will be asked to decide this case based solely on the evidence and the testimony that you hear during the course of the trial, putting aside sympathy for the victim, the alleged victim or for the defendant, passion, prejudice, or public opinion.... Sometimes witnesses become momentarily incapacitated. I certainly don't want you distracted by the nosebleed incident experienced by this witness.
When L.B. returned to the stand, she again became emotional and was not able to complete her testimony. However, the jury was again admonished that the incidents were to be disregarded. Additionally, during closing arguments and in its final charge to the jury, the court emphasized that neither L.B.'s failure to testify nor her brief appearances in the courtroom were to be considered in reaching a verdict.
As the trial court noted in its denial of Mr. Brown's motion for a new trial, every reasonable effort was made in this case to present the victim's testimony and to permit cross examination by the defense. There is no indication that the State contrived to display the reluctant witness, nor that L.B. was allowed to remain before the jury once she was overcome by emotion. To the contrary, the court rejected the State's third attempt to present her testimony, specifying that it might prejudice the defense. We find that under these facts, the trial court's admonishments were sufficient to overcome any potential prejudice arising from sympathy or passion. Accordingly, the denial of a mistrial was not an abuse of discretion. This assignment of error is without merit.

*652 EXCESSIVE SENTENCE

Lastly, Mr. Brown argues that his sentence to life imprisonment at hard labor is unconstitutionally excessive under State v. Dorthey, 623 So.2d 1276 (La.1993).[10]
Neither the transcript nor the minute entry for Mr. Brown's sentencing hearing indicates that the defense objected to the sentence or filed an oral motion to reconsider. The record does not contain a written motion to reconsider the sentence. The failure to move for reconsideration precludes the defendant from raising a claim about the sentence on appeal. La. Code Crim. Proc. art. 881.1 D; State v. Green, 93-1432 (La.App. 4th Cir.4/17/96), 673 So.2d 262, writs denied, 96-1131, 96-1248 (La.10/4/96), 679 So.2d 1379-80. Furthermore, because life imprisonment at hard labor was the mandatory sentence under R.S. 14:42 C at the time Mr. Brown committed this crime, we reject his argument that a lesser sentence was warranted.[11]

ERRORS PATENT
There is a discrepancy between the sentencing transcript and the minute entry regarding Mr. Brown's sentence. The transcript establishes that he was sentenced in compliance with La. R.S. 14:42 C, which precludes the possibility of probation, parole, or suspension of sentence. However, the minute entry reflects only that Mr. Brown's term of imprisonment is to be served without the benefit of probation or suspension of sentence, with no prohibition of parole consideration. Because the transcript prevails, this inconsistency is not a sentencing error. State v. Tanner, 96-0708, p. 5 (La.App. 4th Cir.5/21/97), 696 So.2d 111, 114, writ denied, 97-1665 (La.11/21/97), 703 So.2d 1306, and cases cited therein.
No other errors were detected.

CONCLUSION
For the reasons assigned, Mr. Brown's conviction for the aggravated rape of a child under the age of twelve, and his sentence to life imprisonment at hard labor, is affirmed.
AFFIRMED.
NOTES
[1] In order to preserve the minor victim's anonymity, only her initials will be used, in accordance with court policy. For the same reasons, the victim's relatives will be referred to by first name only.
[2] No further testimony concerning this visit was presented at trial, nor were any medical records presented to document the examination or treatment given.
[3] The quotation in Dr. Wilcox's notes does not contain commas. Commas have been added to this quotation, however, in the trial transcript.
[4] Although not reflected in the trial transcript, appellate counsel suggests that this was the court's rejection of the defendant's motion for a mistrial.
[5] We must first determine whether the entirety of the evidence supports the conviction. State v. Hearold, 603 So.2d 731, 734 (La. 1992). Therefore, the defendant's challenge to the admissibility of this testimony is discussed below.
[6] Folse involved the interpretation of Evidence Code article 804 B(5), a hearsay exception for certain child sexual abuse cases that was added in 1995, subsequent to the trial of this case.
[7] Patricia admitted at trial that she had told L.B. she did not like Patrick Brown, and Lamar was Carolyn's son.
[8] The victim in Rachel was a few weeks shy of her fifth birthday when she developed vaginal bleeding. Distinguishing Cassidy based upon the age difference and because sexual abuse was indicated, the Maryland court held in In re Rachel T. that the child's statement to a medical social worker, identifying her father as the perpetrator, was admissible under the medical treatment hearsay exception.
[9] Illinois Rev. Stat. ch. 38, ¶ 115-13 (1989), provided in pertinent part:

[S]tatements made by the victim to medical personnel for purposes of medical diagnosis or treatment including descriptions of the cause of symptom, pain or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment shall be admitted as an exception to the hearsay rule.
White v. Illinois, 502 U.S. at 351 n. 2, 112 S.Ct. at 740 n. 2.
[10] The defendant also argued that his life sentence was illegal because the transcript of his sentencing hearing was not included in the appellate record. However, the record has since been supplemented with that transcript.
[11] In fact, the statute has since been amended to provide for a possible death penalty for the rape of a child under the age of twelve. 1995 La. Acts 397; 1997 La. Acts 757, 898.