800 So.2d 1124 (2001)
STATE of Louisiana
v.
Donald E. BARNES.
No. 2001-KA-0113.
Court of Appeal of Louisiana, Fourth Circuit.
November 7, 2001.
*1125 Harry F. Connick, District Attorney, Donna R. Musselman, Assistant District Attorney, New Orleans, LA, Counsel for Plaintiff/Appellee.
Mary Constance Hanes, Louisiana Appellate Project, New Orleans, LA, Counsel for Defendant/Appellant.
*1126 Court composed of Chief Judge WILLIAM H. BYRNES III, Judge STEVEN R. PLOTKIN, Judge MIRIAM G. WALTZER.
Judge STEVEN R. PLOTKIN.
There are four issues in this appeal. The first issue is did the trial court err in permitting the medical doctor expert witness to offer testimony as to what one of the rape victims told him and to what the other victim told her treating physician. The second is whether the trial court erred in permitting "other crimes" evidence, specifically that the defendant carried a gun, and that he chased his wife and the rape victims from their home with a gun. The third issue is whether trial counsel rendered ineffective assistance in failing to object to the testimony of "other crimes." The last issue is whether the sentence of life imprisonment was excessive under the circumstances of the case.

PROCEDURAL HISTORY
Defendant Donald Barnes was charged by bill of indictment with forcible rape in violation of La. R.S. 14:42.1, aggravated rape in violation of La. R.S. 14:42, and two counts of aggravated crime against nature in violation of La. R.S. 14:89.1. Defendant pled not guilty. A twelve-person jury found the defendant guilty as charged on all counts and the defendant was sentenced to life imprisonment for aggravated rape, fifteen years for aggravated crime against nature, forty years for forcible rape, and fifteen years for aggravated crime against nature. All of the sentences were imposed without the benefit of probation, parole, or suspension of sentence. The two fifteen year sentences for aggravated crime against nature are to be served consecutively and the remaining sentences are to be served concurrently.

STATEMENT OF FACTS
G.B.[1], the wife of the defendant, and mother and aunt to the victims, testified that her job at a local bakery began at 5:30 am every morning, so she would leave home at 5:00 am. She further testified that her husband would sometimes take her to work when the family had only one car, but usually she drove herself. G.B.'s work schedule meant that the defendant would be home with the two victims and her son each morning. G.B. testified that one afternoon when she arrived home from work her niece, M.C.[2], told her that her daughter, L.C.[3], needed her in the bathroom. When she entered the bathroom her daughter asked her to look at her vaginal area, and G.B. testified that it was covered with sores and blisters, and she had no idea what caused this condition. G.B. took L.C. to the emergency room of University Hospital immediately.
Once at the hospital L.C. was examined and diagnosed with genital herpes. G.B. testified that she was blown away by the diagnosis, and that her daughter had to have gotten the disease from either her husband or her son, because the girls were not allowed to go off alone, and they did not go anywhere unless someone took them. G.B. further testified that when she began questioning her daughter about how she contracted the disease L.C. was silent at first but then began to cry. G.B. then asked her daughter if she got the disease from K.C.[4], her brother, and L.C. responded by saying no. G.B. then asked her daughter if the defendant did this to her, *1127 and she began crying even harder and she finally claimed that the defendant had raped her. As G.B., L.C., and M.C. left the hospital to meet the defendant, who was outside in the car waiting, L.C. told her mother that the defendant had also raped M.C. G.B. made the girls stay behind while she confronted the defendant about what she had just been told. G.B. approached the defendant outside of the hospital and confronted him with the information hoping he would confess. The defendant responded by saying it was a lie. G.B. told the defendant he had two choices, either he called the police and turned himself in or she was going to do it.
The defendant along with G.B., L.C. and M.C. returned home. G.B. directed the girls to go wait in another room with K.C. because she wasn't sure what the defendant was going to do. G.B. was worried about what the defendant might do because he had a temper and history of violent outbursts. The defendant tried to talk to G.B., but she would not respond. G.B. said that she heard the defendant go into a closet, retrieve a pistol, and cock it. G.B. told her children and her niece to run out the back door and across the street to the defendant's aunt's home. The defendant tried to catch them, but was unable to do so. G.B. also went to the defendant's aunt's home and called the police.
G.B. testified that it was the defendant who told her that her daughter was pregnant in June of 1998. Initially G.B. questioned her daughter about when, where, and with whom she had sex, but her daughter would cry and become very upset. Eventually L.C. told her mother that she had gone to a boy's house after school one day. However, on the night she was examined at University Hospital, L.C. told her mother that it was the defendant who had impregnated her, and that the defendant told her to tell her mother the story about the boy. G.B. tested negative for sexually transmitted diseases in May of 1999. Due to marital problems, G.B. and the defendant had not been sexually active for approximately six months prior to discovering that the defendant had been molesting her daughter and niece.
M.C. testified that the defendant began molesting her approximately two to three years after she began living with G.B. and her family. G.B. took M.C. into her home after the death of M.C.'s grandfather, who was also G.B.'s father, because the grandfather had cared for the child most of her life. M.C. was about ten years old and in the fifth grade when the molestation began in 1996. M.C. testified that the molestation began early one morning after her aunt had gone to work and the defendant came into the room she shared with her cousin, L.C., and awakened her, carrying her to the room he shared with her aunt. When they reached the defendant's bedroom he put M.C. in the center of the bed, removing one leg of her underwear and positioning her legs at a right angle with knees bent and raped her. M.C. was confused about what the defendant was doing to her and began to cry. When he was done the defendant told M.C. to go to the bathroom to clean herself up. M.C. did not remember exactly when the defendant first began demanding that she perform oral sex on him, but it would happen after having sex with her. M.C. said that the defendant would molest her about three times a week except Saturday and Sunday because her aunt did not work on those days. She did not tell anyone right away because she was afraid of the defendant, and she knew that he carried a gun. M.C. did eventually tell L.C. because she felt closest to her.
The defendant began molesting L.C. when she was in the eighth grade at about the age of fourteen. L.C. corroborated the *1128 testimony of M.C. L.C. testified that the defendant would awaken her in the early morning hours after her mother had gone to work, and carry her into his bed. Once in his bed, the defendant would remove her clothing and have sex with her. He would also demand that she perform oral sex on him as well. L.C. did not tell anyone what was happening to her because she was afraid. She thought the defendant controlled her mother, and that her mother was just as afraid of the defendant as she was. Eventually L.C. confided in M.C. about what the defendant was doing to her.
Detective Darrell Smith, with the New Orleans Police Department, testified that he responded to a radio call of a rape on Leonidas Street. When he arrived on the scene the detective testified that he took statements from the two victims who relayed to him incidents of rape and oral sex committed by the defendant. As a result of the information gotten from the victims the detective issued a warrant for the defendant's arrest. The detective also collected physical evidence from the scene that consisted of sheets from the defendant's bed, underwear belonging to the victims, as well as underwear belonging to the defendant. The detective referred the victims to Children's Hospital to be examined for signs of sexual abuse.
Dr. Scott Benton, Director of Pediatric Forensic Medicine at Children's Hospital, was qualified as an expert in child sexual abuse and pediatrics. Dr. Benton testified that he conducted an interview and physical exam on M.C. and a physical exam on L.C. at a later date. After conducting his examination and testing of M.C. Dr. Benton found that her hymen was still intact, but she was diagnosed with Chlamydia, a sexually transmitted disease. According to Dr. Benton, it was not an unusual occurrence that M.C.'s hymen was still intact even though she had obviously experienced sexual contact. Also, the doctor testified that because M.C. was not of an age to give consent to sexual contact, he concluded that sexual abuse had occurred.
Dr. Benton conducted a physical exam on L.C. on August 24, 1998. After the physical exam and testing was done, L.C. was diagnosed with Trichomonas, a sexually transmitted disease. Dr. Benton did not observe herpes but noted that the doctor who examined L.C. at the University Hospital had found it to be present when L.C. was examined. The doctor also testified that "most sexually transmitted diseases, even without treatment, generally will burn themselves out or you will have a spontaneous cure." In regard to the defendant three cultures were done on March 22, 2000. Two of these were viral cultures and one of them was a chlamydia culture. Dr. Benton testified that the results of the first two tests were negative, meaning that no virus was isolated and that chlamydia was not found. There was a cautionary note attached indicating that there was a significant time lapse between obtaining the culture and performing the test, and this could result in a false negative, meaning the person really has the disease even though the test comes back negative.
The defendant testified on his own behalf denying the allegations of abuse. The defendant offered a request by the sheriff's department to be tested for sexually transmitted diseases as proof that he was telling the truth. However, the state on cross-examination revealed that the request had been submitted a year after his arrest. The fact that the defendant did not test positive at the time does not mean that he never had the sexually transmitted diseases.

*1129 ERRORS PATENT

A review of the record shows no errors patent.

ASSIGNMENT OF ERROR NUMBER 1
In this assignment of error the defendant complains the trial court erred in permitting Dr. Benton to testify as to what one of the rape victims told him and as to what the other victim told her treating physician because the testimony did not meet the requirements of any exception to the hearsay rule. Specifically, the defendant argues Dr. Benton examined the victims for forensic purposes only, to determine if they were the victims of sexual abuse, therefore, he should not have been allowed to testify as to the events described by them under La. C.E. art. 803(4) exception to the hearsay rule.
Hearsay is a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted. La. C.E. art. 801(c).
La. C.E. art. 803(4), an exception to the hearsay rule, provides:
Statements made for purposes of medical treatment and medical diagnosis in connection with treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to treatment or diagnosis in connection with treatment.
The testimony the defendant claims was erroneously admitted was:
Q. Doctor Benton, in M.C.'s case, what was the history that you obtained?
A. In her case, I began by talking with her. I asked her to tell me why she was here today, and she said, "because my uncle Donald"
At that point defense counsel objected to the hearsay, and the trial court overruled the objection. The prosecutor continued, and the following exchange occurred:
Q. Thank you Doctor Benton. Please continue.
A. Again, I began by asking M.C. why she had come to me today, and she stated "Because my uncle Donald, made me have sex with him when I don't want to. He made me go to his bedroom and he made me suck his private part. Some white stuff came out. He told me it will make my bones strong if I suck the stuff, so I did it." I asked her when is the last time this happened, and she stated, "Tuesday that just passed." I asked her if this happened one time or more than one time, and she said, "More than one time, every day except Saturday and Sunday, ever since we moved to the new house." I asked her why not on Saturday and Sunday, "Because my auntie would at home." I asked her when did she move to the new house, and she said, "September, 1996." I asked her if he did anything else, and she said, "He put his private part in my private part and it hurt, but he said not to worry about it."
Later Dr. Benton continued as follows:
Q. Now, getting back to M.C.'s case, are your findings in her case the history, the physical findings and the lab results of chlamydia, are those consistent withactually, I said history. Are those physical findings consistent with the history she gave you?
A. Yes, ma'am.
Q. And what is your opinion of these physical findings? Are they suggestive of anything to you?
Defense counsel objected, at which time, an unrecorded, off-record discussion was held at the bench. The trial court then *1130 directed the prosecutor to continue, and the following testimony was elicited:
Q. Doctor Benton, in M.C.'s case, let's talk about the considering the history and the physical findings from your examination of the case, are they consistent with sexual abuse?
A. Yes.
Q. And in what way are they consistent?
A. In this case, in M.C.'s case, she gave a history of oral and vaginal penetration by a penis. The physical findings of chlamydia supports sexual contact, and we have a little girl who is under age and unable to give consent. Therefore, the constellation, the history, the physical findings define sexual abuse in this age group.
Q. And could these findings, these physical findings, could they be found in a child who had no sexual contact?
A. No.
As to L.C., Dr. Benton testified as follows:
Q. Okay. And in this particular case, did you take a history?
A. I took a medical history, including background review. Yes. But I did not do the private interview like I did last time, since that was already done previously.
Q. At University?
A. At University or with someone else.
Q. And what was your particularactually, your particular history obtained in this case primarily was the meds already received from University?
A. And then I obtained a medical history, and in that medical history there was disclosure related to the visit that said that they thought that the reason she had the sexually transmitted diseases was because she had been raped by her stepfather.
Dr. Benton was not allowed to testify about statements made to him by M.C. because the trial court held that they did not involve medical treatment or diagnosis. Dr. Benton testified that in all cases of medicine, the history plays an important role in deciding what your final diagnosis is going to be, as well as in guiding what you're going to do. This Court in State v. Lawrence, 98-0348 (La.App. 4 Cir. 12/1/99), 752 So.2d 934, writ denied, 00-0003 (La.6/16/00), 764 So.2d 962, noted that it had considered the scope of La. C.E. art. 803(4) hearsay exception under circumstances similar to those in the instant case in State v. Coleman, 95-1890, pp. 4-6 (La. App. 4 Cir. 5/1/96) 673 So.2d 1283, 1886-87. In Coleman this Court held that the extent to which a physician's hearsay testimony is admissible under this exception must be determined by the purpose of the examination at issue. "The Coleman court determined that the doctor in that case should not have been permitted to testify as to the events described to him by the victim and her mother." State v. Lawrence, 752 So.2d at 940. While a subsidiary purpose of the doctor's evaluation in Coleman was to identify and treat any sexually transmitted diseases or physical harm that may have resulted from rape, the principal reason for the examination was forensic. The court further stated that the hearsay was inadmissible, but the error was harmless when viewed against the entire record.
In Lawrence this Court distinguished between the two doctors who testified at trial, Dr. Coffman and Dr. Barnes. Dr. Coffman's testimony included a history which was taken "in conjunction with an attempt to determine if scientific evidence existed to confirm the child's allegations." This Court held that this did not fall under the 803(4) hearsay exception. However, *1131 the victim in Lawrence visited Dr. Barnes the day after the occurrence to determine whether any physical injury or disease had resulted from the assault. Thus, the victim's statements to Dr. Barnes were made for the purpose of medical treatment and therefore properly admitted under 803(4). In the instant case, M.C. was seen by Dr. Benton very soon after she told her mother about the alleged assaults. L.C. could not be seen until a later date because when she was initially scheduled for an appointment she was having her period. Even if Dr. Benton's testimony in regard to L.C. was hearsay it was harmless error to admit it into evidence.
Harmless error exists where the guilty verdict actually rendered at trial was surely unattributable to the error. Sullivan v. Louisiana, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993). In the instant case, as in Coleman, Dr. Benton took a history and examined the victims to determine if sexual abuse had occurred, and to treat any sexually transmitted diseases or other harm as a result of the rapes. Dr. Benton, like the doctor in Coleman, learned of the rapes of the victims because they had been referred to Children's Hospital by the New Orleans Police Department and University Hospital respectively.
"In determining that the erroneous admission of testimony does not require reversal of a conviction, the reviewing court must be convinced that the error was harmless beyond a reasonable doubt." State v. Lawrence, 752 So.2d at 943, citing State v. Hawkins, 96-0766, p. 5 (La.1/14/97), 688 So.2d 473, 478. The admission of the hearsay testimony of Dr. Benton should be considered a harmless error because his testimony was merely cumulative to the victims' testimony. The victims consistently stated that the rapes occurred in the early morning hours. The victims also testified that the defendant would carry them to his bed to assault them. Also, the jury, as the trier of fact, found the testimony of the victims to be more credible than the defendant's testimony. Further, Dr. Benton's testimony about L.C. was relatively limited as he deferred to the reports from University Hospital. Therefore, the guilty verdicts are attributable to evidence other than the hearsay testimony of Dr. Benton.

ASSIGNMENTS OF ERROR NUMBER 2 AND 3
In these assignments of error the defendant complains the trial court erred in permitting "other crimes" evidence, specifically, that the defendant carried a gun, and that he chased his wife and the victims from their home with a gun. The defendant also complains that his trial counsel rendered ineffective assistance by failing to object to the testimony of the "other crimes" evidence.
La.C.Cr.P. Article 841 provides that an irregularity or error cannot be availed of after the verdict unless it was objected to at the time of the occurrence. Therefore, the defense counsel's failure to object to the "other crimes" evidence failed to preserve this issue for appellate review.
However, the defendant complains counsel was ineffective for failing to object. This Court in State v. Jason, 99-2551 (La.App. 4 Cir. 12/6/00), 779 So.2d 865, 871, citing Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), stated that the claim of ineffective assistance of counsel is to be assessed by the two part test of Strickland. The defendant must show that his counsel's performance was deficient and that the deficiency prejudiced him. Counsel's performance is ineffective when it can be shown that he made errors so serious that counsel was not functioning as the "counsel" *1132 guaranteed to the defendant by the Sixth Amendment. State v. Jason, 779 So.2d 865 at 871. Counsel's deficient performance will have prejudiced the defendant if he can show that the errors were so serious as to deprive him of a fair trial. To carry this burden, the defendant "must show that there is a reasonable probability that, but for the counsel's unprofessional errors, the result of the proceedings would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.
Generally, "other crimes" evidence is not admissible at trial. However, when such evidence tends to prove a material issue and has independent relevance other than showing the defendant's bad character, it may be admitted by certain statutory and jurisprudential exceptions to the exclusionary rule. State v. Jackson, 625 So.2d 146 (La.1993). Evidence of other acts is allowed to prove motive, opportunity, preparation, plan, knowledge, identity, absence of mistake or accident, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceedings. La. C.E. art. 404B (1).
One of these factors must be at issue, have some independent relevance, or be an element of the crime charged in order for the evidence to be admissible. State v. Jackson, id. The improper admission of other crimes evidence is subject to harmless error review. State v. Johnson, 94-1379 (La.11/27/95), 664 So.2d 94. See Sullivan v. Louisiana, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993).
If the admission of the testimony of the defendant having a gun by the victims and the defendant's wife was error, it was harmless. The victims consistently testified of the acts committed against them by the defendant. Also, the jury, as trier of fact, found the testimony of the victims to be more credible than the defendant's testimony. Introducing this evidence was harmless error at most and therefore did not contribute to the verdicts, and thus the defendant cannot show prejudice. Failing to show prejudice, his ineffective assistance of counsel claim also fails.

ASSIGNMENT OF ERROR NUMBER 4
In the final assignment of error the defendant complains that the trial court erred by sentencing him to a life sentence for aggravated rape because it was unconstitutionally excessive.
Although a sentence is within the statutory limits, the sentence may still violate a defendant's constitutional right against excessive punishment. State v. Sepulvado, 367 So.2d 762 (La.1979). A sentence is unconstitutionally excessive if it makes no measurable contribution to acceptable goals of punishment, is nothing more than the needless and purposeless imposition of pain and suffering, and is grossly out of proportion to the severity of the crime. State v. Lobato, 603 So.2d 739 (La.1992).
Generally, a reviewing court must determine whether the trial judge adequately complied with the sentencing guidelines set forth in La.C.Cr.P. art. 894.1 and whether the sentence is warranted in light of the particular circumstances of the case. State v. Soco, 441 So.2d 719 (La. 1983).
If adequate compliance with Article 894.1 is found, the reviewing court must determine whether the sentence is too severe in light of the particular circumstances of the case, keeping in mind the maximum sentences should be reserved for the most egregious violators of the offense so charged. State v. Quebedeaux, 424 So.2d 1009 (La.1982).
*1133 In Solem v. Helm, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983), the U.S. Supreme Court set forth three objective factors to guide reviewing courts in determining whether a sentence is cruel, unusual and excessive under the Eighth Amendment of the United States Constitution as follows: (1) the gravity of the offense and the harshness of the penalty; (2) the sentence imposed on other criminals in the same jurisdiction; and (3) the sentence imposed for commission of the same crime in other jurisdictions. Also see State v. Pierre, 99-3156 (La.App. 4 Cir. 7/25/01), 792 So.2d 899. The Louisiana Supreme Court addressed the constitutionality of mandatory life sentence for a fifteen year-old convicted of aggravated rape in State v. Foley, 456 So.2d 979 (La.1984) and after applying the Helm factors found that the defendant's life sentence was not disproportionate to his crime or excessive by either the United States or Louisiana Constitutions. In State v. Brown, 97-2260 (La.App. 4 Cir. 10/6/99), 746 So.2d 643, this Court held that the defendant's mandatory life sentence for the defendant's conviction of aggravated rape of a six year-old girl was not excessive.
Furthermore in Harmelin v. Michigan, 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991), the U.S. Supreme Court modified the Eighth Amendment standards in favor of the states. The Court held that the Solem v. Helm analysis was only required in cases where the sentence imposed was "grossly disproportionate" to the offense.
In the instant case, the life sentence is not grossly disproportionate to the crime. The defendant repeatedly raped two minors in his home and had sex with both of them. Considering these facts, the defendant's sentence does not shock one's sense of justice and it was not excessive.

CONCLUSION
For the foregoing reasons, we find that the trial court did not err in allowing Dr. Benton to testify as to what the victim told him. It was harmless error to permit evidence of the defendant carrying the gun and him chasing the victims so counsel was not ineffective for failing to object to this. Given the extent of the crimes and the age of the victims, this was not an excessive sentence.
Therefore, the defendant's conviction and sentences are affirmed.
AFFIRMED.
NOTES
[1] Due to the nature of the charges the initials of the defendant's wife, who is also the mother of L.C. and aunt of the M.C., and the victims will be used.
[2] M.C. is one of the rape victims.
[3] L.C. is also a rape victim.
[4] K.C. is G.B.'s son.