744 So.2d 165 (1999)
STATE of Louisiana
v.
Tyrone JONES a/k/a Kim Jones.
No. 97-KA-2591.
Court of Appeal of Louisiana, Fourth Circuit.
September 8, 1999.
*166 Harry F. Connick, District Attorney of Orleans Parish, Charles E.F. Heuer, Assistant District Attorney, New Orleans, Louisiana, Counsel for Appellee.
Yvonne Chalker, Louisiana Appellate Project, New Orleans, Louisiana, Counsel for Appellant.
Court composed of Judge STEVEN R. PLOTKIN, Judge CHARLES R. JONES, Judge MIRIAM G. WALTZER.
PLOTKIN, Judge.
On July 11, 1996, defendant-appellant Tyrone Jones, a/k/a Kim Jones, was charged by grand jury indictment with aggravated rape, La. R.S. 14:42 (count one); aggravated crime against nature, La. R.S. 14:89.1 (count two); attempted first degree murder, La. R.S. 14:27(30), (counts three, five, eight and nine); attempted aggravated rape, La. R.S. 14:27(42) (count four); aggravated burglary, La. R.S. 14:60 (count six); and armed robbery, La. R.S. 14:64 (count seven).
Defendant was arraigned on July 16, 1996, and pled not guilty. The State amended counts three, five, eight and nine to attempted second degree murder, La. R.S. 14:27(30.1), on January 31, 1997. The case proceeded to trial on the first six counts only, as the last three counts arose out of separate incidents. On February 6, 1997, a twelve member jury found the defendant guilty of forcible rape (count one); aggravated battery (counts three and five), attempted forcible rape (count four), and simple burglary (count six). Defendant was found not guilty on count two, aggravated crime against nature.
Thereafter, the State filed a multiple bill of information. On March 11, 1997, the defendant filed a motion for new trial which the trial court denied. Defendant then waived all sentencing delays. The court found the defendant to be a third offender and sentenced him on count one as a third offender to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence. On count three, he was sentenced to ten years at hard labor, with the sentence to run concurrently with the sentence in count one. On count four, he was sentenced to twenty years at hard labor without benefit of parole, probation or suspension of sentence, with the sentence to run consecutively to counts one and three. On count *167 five, he was sentenced to ten years at hard labor, with the sentence to run concurrently with count four and consecutively to counts one and three. On count six, he was sentenced to twelve years at hard labor, with the sentence to run concurrently with counts one and three and consecutively to counts four and five.
Also on March 11, 1997, defendant entered a conditional plea of guilty on the remaining counts (seven, eight and nine) under North Carolina v. Alford, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970). The trial court subsequently sentenced defendant to serve twenty years at hard labor without benefit of parole, probation or suspension of sentence on each of those counts, those sentences to run concurrently with those imposed on the first six counts. On June 30, 1997, defendant filed a motion for appeal. This appeal directly concerns only the first six counts.

STATEMENT OF FACTS:
S.M. testified that, in 1995, the defendant started following her around and telling her he liked her. He introduced himself and spoke to her at least nine or ten times. He would often appear while she waited at a bus stop, sometimes riding the bus with her; and once he followed her while she paid a bill. At first, S.M. thought him harmless, but she did tell him that she had a boyfriend. Eventually, she became frightened. One time he appeared at her door, and her mother, with whom she lived, told him that she was in the shower. S.M.'s mother, C.M., testified that she answered the door on September 1, 1995a day she remembered because her son was married earlier that dayand that the defendant asked for "Uncle Yancy." C.M. said there was no one there by that name. Defendant came to the house as many as three more times, asking for S.M. by name and introducing himself as "Kim," but S.M. told her mother that she did not wish to see him.
On the morning of November 12, 1995, C.M. awoke to find the defendant standing over her with a knife in one hand and a shovel in the other. She screamed, but the defendant told her to shut up or else he would "stab [her] f___ing ass to death." He took her outside her house, onto her patio, ripped her underclothes off, made her lie on her back and tried to rape her. However, he could not attain an erection. He took her back into the house, tied up her hands and feet with cords from his pockets, and told her to lie on the floor near the kitchen. He pulled a stocking or mask out of his pocket, pulled it over his head and went upstairs, where S.M. was sleeping.
S.M. awoke to find the defendant standing over her. She immediately recognized his distinctive voice. S.M. testified that, despite the stocking he wore, she was also able to identify him by his bad skin, gold teeth, and birthmark. The defendant warned her not to scream or else he would "cut [her] f___ing throat." He took her downstairs, and told her to lie on the floor, where, S.M. testified, he performed oral sex on her. He put something over her face then vaginally raped her. Afterward, he told her to stand up and, with a knife at her throat, took her into her mother's bedroom. He asked her where any money and jewelry were located, emptying the drawer to which she directed him. He then took her into the front room, where he took the "[sofa] pillow and put the pillow on top of [her] head and sat on it." He then emptied a garbage bag from the kitchen trashcan, put it over her head, led her into the bathroom and began filling the tub with hot water. He tried to push S.M.'s head down into the water, which burned her hands as she resisted. Defendant pressed the bag against her face, and she told him that she could not breathe. She tried to chew through the plastic, but defendant threatened her with the knife again. S.M. responded by laying quietly on the floor, and eventually defendant left the room. When she knew he was gone, she rose, removed the bag and slipped into the hallway.
From the hallway, S.M. saw the defendant beating her mother. At some point, *168 defendant had removed the stocking or mask; and S.M. could now see his face more clearly. While defendant had been preoccupied with S.M., C.M. had managed to work her hands free and was attempting to fight back. However, defendant broke her nose during the struggle. S.M. moved into C.M.'s bedroom, closed and locked the door and called 911. She simply put down the receiver, though, and escaped through the bedroom window because she did not want the defendant to find her. She fled to the house of a neighbor, who called 911 as well. C.M. testified that someone rang the doorbell thereafter and that the defendant fled through the patio door.
At trial, Detective Tracey Mercadel testified that she interviewed S.M. and C.M. separately and was able to obtain an address and the name "Kim." Detective Mercadel was then able to match the address and alias "Kim" to the defendant, Tyrone Jones. Detective Mercadel obtained a photograph of defendant and placed it with five other photographs. The day after the attack, S.M. and C.M. separately identified defendant's picture from the photographic lineup, and Detective Mercadel obtained an arrest warrant for defendant.

ERRORS PATENT:
A review of the record for errors patent reveals none.

ASSIGNMENT OF ERROR ONE:
In his first assignment of error, defendant maintains that the trial judge improperly dismissed a juror in the midst of the trial. During the trial, one of the jurors revealed that he knew the defendant's mother, who was a potential witness. He told the judge that, even though he did not know the mother's name, she knew his entire family and had "come up" with his brothers. After a colloquy with the juror, the judge released him and replaced him with an alternate. The defendant now argues that the trial judge's actions were erroneous.
A relationship between a juror and the participants is not necessarily a disqualifying fact. State v. Fairley, 25,951 p. 3 (La.App. 2 Cir. 5/4/94), 645 So.2d 213, 216, writ denied 94-1940 (La.11/11/94), 645 So.2d 1152. The existence of a relationship, even one of blood or marriage, is not sufficient to disqualify a juror unless it is shown that the relationship is sufficient to preclude the juror from arriving at a fair verdict. State v. Peterson, 446 So.2d 815 (La.App. 2 Cir.1984). The law does not require that a jury be composed of individuals who are totally unacquainted with the defendant, the prosecuting witness, the prosecuting attorney, and the witnesses who may testify at trial. It requires that jurors be fair and unbiased. State v. Shelton, 377 So.2d 96 (La.1979). A prospective juror's statement that he will be fair and impartial is not binding on the trial court. If the revealed details of the relationship are such that bias or prejudice may be reasonably implied, a juror may be properly refused for cause. State v. Lewis, 391 So.2d 1156 (La.1980).
As the above recitation of law makes clear, the touchstone for dismissal of a juror is the juror's inability to consider evidence impartially. In this case, the juror repeatedly stated that his knowing the defendant's mother and her knowing his family would affect his decision. In the most telling exchange, the trial judge explained to the juror that "the ultimate question is whether or not you can make a determination, based on the witnesses who are presented to you and the evidence that you have to look at, whether or not the State of Louisiana has proven beyond a reasonable doubt Tyrone Jones committed this offense...." The juror replied, "I don't think I can do that." The juror made several similar statements in the course of his colloquy with the judge and counsel, and he admitted he did not want to vote on the case. The trial judge was in the best position to determine the juror's impartiality; therefore, it cannot be said that the dismissal of the juror constituted an abuse of discretion.
This assignment of error is without merit.

*169 ASSIGNMENT OF ERROR TWO:

The defendant next alleges that the State did not present sufficient evidence to prove his identity.
The relevant inquiry when reviewing a conviction for the sufficiency of the evidence is whether, upon viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Marshall, 94-1282 (La.App. 4 Cir. 6/29/95), 657 So.2d 1106; La.C.Cr.P. art. 821. Where the defendant asserts he was not the perpetrator, the state bears the burden of negating any reasonable probability of misidentification. State v. Powell, 27,959 (La.App. 2 Cir. 4/12/96), 677 So.2d 1008, writ denied, 96-1807 (La.2/21/97), 688 So.2d 520. In the absence of internal contradiction or irreconcilable conflict with physical evidence, the testimony of one witness, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Ford, 28,724 (La.App. 2 Cir. 10/30/96), 682 So.2d 847, writ denied, 99-0210 (La.5/14/99), 745 So.2d 12. Additionally, a jury's credibility decision shall not be disturbed unless it is clearly contrary to the evidence presented. State v. Harris, 624 So.2d 443 (La.App. 4 Cir.1993), writ denied 93-2609 (La.6/24/94), 640 So.2d 1339; State v. Cashen, 544 So.2d 1268 (La.App. 4 Cir.1989).
Here, the jury observed as the two victims, both of whom had seen and spoken to the defendant on numerous previous occasions, identified him easily. The nature of his crimes necessarily brought them into close contact with him. They were confident of their identification based on numerous physical characteristics, including hair, skin, voice, teeth and a birthmark. Both victims identified him confidently in proper, separate photographic lineups and at trial. Moreover, the victims' testimony did not conflict with the physical evidence presented. Consisting largely of the "rape kits" taken from both victims, the physical evidence neither inculpated nor exculpated the defendant; and the case properly turned on the victims' identification of their assailant. This court will not disturb the jurors' finding that the victims were credible.
The defendant also argues that the State failed to prove simple burglary because it did not present sufficient evidence that the defendant stole anything from the house. This argument rests on a misunderstanding of burglary. As defined by La. R.S. 14:62, "[s]imple burglary is the unauthorized entering of any dwelling... with the intent to commit a felony or any theft therein...." (Emphasis added.) The essence of burglary, then, is an unauthorized entry with criminal intent; a taking is not required. The evidence was more than sufficient to prove that the defendant entered the victims' home with criminal intent.
This assignment of error is without merit.

ASSIGNMENT OF ERROR THREE:
Finally, the defendant argues the trial court erred in ordering that some of the sentences imposed be served consecutively.
La.C.Cr.P. art. 883 provides:
If the defendant is convicted of two or more offenses based on the same act or transaction, or constituting parts of a common scheme or plan, the terms of imprisonment shall be served concurrently unless the court expressly directs that some or all be served consecutively. Other sentences of imprisonment shall be served consecutively unless the court expressly directs that some or all of them be served concurrently.
(Emphasis added.) In State v. McCray 28,531 (La.App. 2 Cir. 8/21/96), 679 So.2d 543, the Second Circuit stated:
It is within a trial court's discretion, however, to order sentences to run consecutively rather than concurrently. State v. Coates, 27,287 (La.App. 2 Cir. 9/27/95), 661 So.2d 571, writ denied [95-2613 (La.2/28/96), 668 So.2d 365]; State v. George, 26,867 (La.App. 2 Cir. 4/5/95), 652 So.2d 1382, writ denied [95-1151 (La.9/29/95), 660 So.2d 855]. Moreover, where the convictions stem from separate incidents involving different victims *170 and occur over a lengthy period of time, the resulting consecutive penalties will not be found to be an abuse of that discretion.
Here, the trial court ordered that the sentences imposed for crimes committed against C.M. be served consecutively to those crimes committed against S.M. Although the crimes here arose from a single course of conduct, they affected more than one victim, were particularly heinous, and were apparently premeditated. In light of these factors, the trial court did not abuse its discretion in ordering that the sentences be served consecutively. State v. Johnson, 97-867 (La.App. 5 Cir. 4/15/98), 711 So.2d 848, writ denied, 98-1293 (La.10/9/98), 726 So.2d 20; State v. Barnett, 96-2050 (La.App. 1 Cir. 9/23/97), 700 So.2d 1005.
This assignment of error is also without merit. Accordingly, the convictions are affirmed.
AFFIRMED.