JAMES F. McKAY III, Judge.
 

 11 STATEMENT OF CASE
 

 On January 11, 2009, Donald Swanzy, the defendant, was charged by bill of information with four counts of theft of property valued at over one thousand dollars. The defendant pled not guilty at arraignment on March 30, 2010. On May 7, 2009, the trial court heard testimony on defense motions and denied the motion to suppress the evidence and found probable cause. A
 
 Prieur
 
 hearing was held on August 11, 2009, on the State’s notice of intent to introduce evidence of other crimes pursuant to La. C.E. 404(B)(1), wherein the State sought to introduce evidence of the defendant’s theft convictions in Jefferson Parish. The trial court granted the motion in part and denied it in part. Trial commenced on September 1, 2009. After a one day recess, trial resumed on September 3, 2009. On count one of the bill of information, the jury found the defendant guilty of the lesser included offense of theft of property valued at more than three hundred dollars but less than five hundred dollars. The jury found the defendant not guilty on counts two, three, and four.
 

 On December 4, 2010, the trial court sentenced the defendant to two years at hard labor, suspended, two years active probation, and fined the defendant one ^thousand dollars. The defendant’s sentence was ordered to be served concurrently with the sentence he received in Jefferson Parish.
 

 STATEMENT OF FACT
 

 Terry Kutcher testified that in May of 2007, as the President of Chisholm Trail Construction, an Oklahoma based company, he entered into a contract with the defendant involving the demolition of Twi-Ro-Pa Mills, an industrial structure on Tchoupitoulas Street in New Orleans.
 

 The defendant through his company, Mardi Gras Management, was the general contractor on the project. By the terms of the contract, Mr. Kutcher was obligated to provide heavy equipment and personnel to be used to complete the demolition. Some of that equipment, including a 2005 Dodge truck, the subject of count one of the bill of information, was leased from Jack Stute-ville. Tim Gooch was Mr. Kutcher’s job superintendent, and Scott Hancock was an equipment operator who worked at the site.
 

 Mr. Kutcher testified that at some point the defendant sent him invoices for repairs to four different vehicles, the previously mentioned 2005 Dodge truck, a 2001 Mack truck, a 1997 Ford truck, and a 2001 Dodge truck. Mr. Kutcher related that he did not authorize the defendant to perform any of the repairs that the defendant alleged to have performed on the vehicles. Furthermore, Mr. Kutcher did not authorize the defendant to remove the 2005 Dodge truck from the jobsite to his yard where the repairs were allegedly performed and where the vehicle was subsequently stored. The defendant added that neither Mr. Gooch nor Mr. Hancock was authorized to order any repairs to any of the vehicles.
 

 
 *116
 
 After receiving the repair bills, Mr. Kutcher’s relationship with the defendant deteriorated. Mr. Kutcher and Mr. Stute-ville were unsuccessful in ^attempting to discern whether any repairs were actually completed on any of the vehicles. Eventually, unsuccessful attempts were made to pay the bills in order to regain possession of the equipment, which included hiring an attorney and entering negotiations with the defendant’s attorney, Valerie Oxner. In the end, Mr. Kutcher was not able to regain possession of his equipment from the defendant.
 

 Tim Gooch testified that he met the defendant when he came to New Orleans to work on the Twi-Ro-Pa demolition project. Mr. Gooch was responsible for running all the heavy equipment involved in tearing the building down and moving the debris off the site.
 

 Mr. Gooch testified that one morning near the end of July, the defendant and several drivers arrived at the site. The defendant knocked on the door to his camper and told him that he was there to pick up the equipment. Mr. Gooch told him he could not take any of the equipment because it was not his. The defendant replied that he could take whatever he wanted to take as they were shutting the job site down and that he needed to be off the property by that evening.
 

 Mr. Gooch also testified that the defendant took a 2005 Dodge truck, “a skids-teer, a track hoe, three buckets, and a set of fork lifts.” Afterwards, Tim Gooch noticed that the chain closing the gate to the yard where the defendant entered had been cut. Tim Gooch called the police, but they did not arrive until that evening. After Mr. Gooch explained what happened, the police informed him that it was a civil matter and there was nothing they could do.
 

 Jack Stuteville testified that he worked primarily as a banker in Oklahoma, but that he was also a farmer, the mayor of his community, and a businessman. He identified himself as the owner of a 2005 Dodge truck. He identified the title to the |4vehicle and the bill of sale which showed that it was purchased for $83,391.60. The documents were introduced into evidence.
 

 With respect to the 2001 Mack truck, the subject of count two of the bill of information, Mr. Stuteville explained that he had wired money to a salvage auction company to purchase the vehicle. Because Mr. Stuteville did not have an account with the company, he utilized the account of his business associate, Tommy Lockhart. Mr. Stuteville expected that the vehicle would clear the salvage company with an open title; however, it was titled under Mr. Lockhart’s name.
 

 Mr. Stuteville testified that he became involved with the Twi-Ro-Pa project after Terry Kutcher leased some equipment from him. Tommy Lockhart was also involved in the project.
 

 Mr. Stuteville stated that he did not know the defendant and did not authorize him to take possession of the 2005 Dodge truck or perform any repairs on it. At some point, Mr. Stuteville began receiving some repair bills from the defendant for repair work to the Dodge truck as well as a Mack truck. Mr. Stuteville recalled participating in a conference call with Terry Kutcher where he considered paying the bills simply to regain possession of his equipment, but nothing ever came of it.
 

 Mr.Jack Stuteville identified a letter that he received from Valerie Oxner wherein she advised that unless payment was made, she was going to use the Louisiana Storage Vehicles Law to obtain permits to sell the equipment. Mr. Stuteville did not recall whether he ever received any correspondence from the State of Lou
 
 *117
 
 isiana regai’ding permits to sell being issued.
 

 Lloyd Michell testified that he is the owner of Dale’s Towing. He testified that on the day in question his company towed a one ton truck and a skid steer off |sof the Twi-Ro-Pa site at the request of the defendant. Mr. Michell did not know the owners. He towed the vehicles as part of his contract with the defendant and that he had no reason to believe that the defendant did not have authority to move the vehicles.
 

 Mr. Michell also confirmed that the defendant did perform repair work on vehicles and equipment at his yard and that he had performed repairs for him in the past. Mr. Michell also stated that he purchased a bulldozer from the defendant that was subsequently seized by the Plaquemine’s Parish Sherriffs Office. He subsequently reacquired possession of the bulldozer but not title to it.
 

 Gladue Joseph Istre, a licensed Louisiana Private Investigator, testified that he became involved in the case after being contacted by Lloyd Michell to examine some transfer documents relating to a piece of equipment he had purchased from the defendant as well as other pieces of equipment involved in this case, some of which had been acquired by Charles McGowan.
 

 In the course of verifying the authenticity of the documents he received from Lloyd Michell and Charles McGowan, Gla-due Joseph Istre contacted a company called Towing and Recovery Professionals, who the defendant engaged to assist in obtaining permits to sell the vehicles. Mr. Istre questioned the validity of the documents and voiced his concern to a supervisor at the company.
 

 In his review of the documents, Mr. Istre noticed that the First Capital Bank of Oklahoma was a lien holder and a possible owner of some of the equipment at issue. As such, Mr. Istre called the bank and spoke to Mr. Stuteville. Later he spoke with Terry Kutcher.
 

 Mr. Istre met with the defendant regarding his possession of the equipment and reviewed documentation in the defendant’s possession relative thereto. Mr. 1 fiIstre told the defendant that his methods of acquiring titles to the vehicles was improper. The defendant showed him four transfer titles issued by the Louisiana Department of Motor Vehicles. He questioned the defendant regarding whether he had any documentation demonstrating his authorization to perform any repairs on the vehicles, which he did not. The defendant advised him that he had originally taken possession of the vehicles because of money that was owed to him and that he was selling the equipment to recover the money.
 

 Later, Mr. Istre contacted the New Orleans Police Department in order to verify that on July 25, 2007, a report was made regarding the theft of equipment at the Twi-Ro-Pa site. Mr. Istre learned that a theft was initially reported but that the signal was changed to a miscellaneous civil incident.
 

 Mr. Istre stated that he had been paid at least ten or twelve thousand dollars by First Capital Bank of Oklahoma for services rendered during the previous year and a half
 

 Officer Mike Duzmal testified that he became involved in the case in June of 2008. At the time, he was assigned to the Sixth District Investigative Unit. Officer Duzmal became involved with the case when he was approached by Mr. Istre to determine whether there had been a report of a theft at the Twi-Ro-Pa job site on Tchoupitoulas Street. Officer Duzmal discovered that a car had been sent to the
 
 *118
 
 location and that the two officers involved marked it up as being a civil matter because there was no paperwork available to establish who owned the property in question. Officer Duzmal testified that he reopened the investigation and entered four vehicles, including the 2005 Dodge truck, into the NCIC database as being stolen so that they could be recovered by the State Police.
 

 17Jill Jarreau testified that she was employed by the Office of Motor Vehicles, Stored Vehicle Unit. She is responsible for overseeing permits to sell and permits to dismantle. Generally speaking, Ms. Jar-reau explained the process for obtaining a permit to sell. Ms. Jarreau then identified four permits to sell that were issued by her department, which included a permit to sell the 2005 Dodge truck in question.
 

 Ms. Jarreau explained that prior to the issuance of a permit, it is verified that the vehicle has not been previously reported stolen. If a vehicle has been identified as stolen in the NCIC database, no permit to sell will be issued. Accordingly, Ms. Jar-reau was confident that none of the four vehicles was identified as stolen in the NCIC database when the permits were issued. Trial adjourned for the day after Ms. Jarreau completed her testimony.
 

 The following day, State Trooper Andrew Pratt testified that he recovered the four vehicles in question. The 2005 Dodge truck was recovered in Chalmette, Louisiana from Timothy Sawyer.
 

 Valerie Oxner testified that she has known the defendant for some fifteen years and during that time she had represented various business interests he has been associated with. Ms. Oxner related that she first became involved in the Chi-solm Trail Construction controversy in May or June of 2007 and that she personally observed all four vehicles in question at the defendant’s yard at that time.
 

 Ms. Oxner related that she advised the defendant to prepare demand letters and to issue them to the parties involved along with the appropriate invoices for the work that was completed. She stated that she had several conversations with Mr. Stute-ville, Mr. Kutcher, and Mr. Lockhart. All three men acknowledged that the repairs were made and that they were obligated to pay for them; however, only Mr. |sLockhart paid for any repairs. She stated that the defendant did the repairs for the vehicles in May and June of 2007, and that she began sending demand letters in June.
 

 Ms. Oxner related that the first complaint she ever received about the defendant’s possession of the vehicles was in October of 2008 when he was arrested. She stated that she never received a letter form Chisolm Trail requesting that the vehicles be returned.
 

 Ms. Oxner explained the legal steps she undertook to collect the bills for the repairs which involved perfecting mechanic’s liens for the vehicles under La. R.S. 9:4501.
 

 In October, after many months of not being paid, she proceeded with the process to obtain permits to sell the vehicles. The notice requirements were completed by a company called Towing and Recovery Professionals which is in the business of assisting companies with the process of dealing with the Office of Motor Vehicles. In the end, Ms. Oxner was able to obtain the appropriate permits form the Office of Motor Vehicles.
 

 Ms. Oxner identified a bill in the amount of $22,992.51 that she sent to Mr. Stute-ville. Ms. Oxner identified correspondence issued to Mr. Stuteville and Mr. Kutcher requesting payment for the repairs that were performed. Ms. Oxner related that in all the time she represented the defen
 
 *119
 
 dant, she did not receive any correspondence from Mr. Stuteville or Mr. Kutcher stating in any way that invoices were fraudulent or that they demanded the return of the property. Ms. Oxner pointed out that pursuant to the notice requirements involved in obtaining the permit to sell Mr. Stuteville was given the opportunity to request a hearing in order to dispute the validity of the mechanic’s liens.
 

 |nOn cross examination, Ms. Oxner admitted having a romantic relationship with the defendant. Ms. Oxner also had difficulty identifying photographs of the vehicles she reported seeing at the site in June.
 

 The State then called Thomas Lockhart. Much of Mr. Lockhart’s testimony focused on the dispute between himself and Mr. Stuteville regarding the ownership of the Mack truck which was the subject of count two of the bill of information and for which the defendant was found not guilty. Mr. Lockhart maintained that he was the rightful owner of the Mack truck. He explained that even though Mr. Stuteville paid for the vehicle, this was offset by money that Mr. Stuteville already owed him.
 

 In any case, Mr. Lockhart testified that he had authorized the defendant to perform the repairs on the Mack truck that were completed. The state then impeached this testimony by playing a portion of Mr. Lockhart’s tape recorded statement to State Trooper Andrew Pratt. During his statement, Mr. Lockhart stated that the defendant had performed the repairs without his knowledge or consent. He stated that the defendant did the same thing with respect to the other equipment that he picked up from Tw-Ro-Pa.
 

 During cross examination, Mr. Lockhart testified that he had filed a civil suit against Mr. Stuteville alleging that he was owed $200,000 for work he performed on the Twi-Ro-Pa project as well as two other suits arising out of other projects. He also explained that the Mack truck needed a great deal of work in order to be considered road worthy and that the repairs were performed. Mr. Lockhart also stated that the repairs to the other vehicles in question were also authorized, including the repairs to the 2005 Dodge truck. Mr. Lockhart also related that the State Police had confiscated the Mack truck from him.
 

 110ERRORS PATENT
 

 A review of the record for errors patent reveals none.
 

 ASSIGNMENT OF ERROR NUMBER
 

 In his only assignment of error, the defendant argues that the evidence was insufficient to support his conviction. When reviewing the sufficiency of the evidence to support a conviction, this Court is controlled by the standard set forth by the United States Supreme Court in
 
 Jackson v. Virginia,
 
 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), which dictates that to affirm a conviction “the appellate court must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt.”
 
 State v. Captville,
 
 448 So.2d 676, 678 (La.1984). “In the absence of internal contradiction or irreconcilable conflict with the physical evidence, one witness’s testimony, if believed by the trier of fact, is sufficient to support a factual conclusion.”
 
 State v. Robinson,
 
 2002-1869, p. 16 (La.4/14/04), 874 So.2d 66, 79;
 
 State v. Jones,
 
 97-2591, p. 7 (La.App. 4 Cir. 9/8/99), 744 So.2d 165, 169. Under the
 
 Jackson
 
 standard, the rational credibility determinations of the trier of fact are not to be second guessed by a reviewing court.
 
 State v. Juluke,
 
 98-0341, p. 4 (La.1/8/99), 725 So.2d 1291, 1293.
 

 
 *120
 
 “[W]hen there is conflicting testimony about factual matters, the resolution of which depends upon a determination of credibility of the witness, the matter is one of the weight of the evidence, not its sufficiency.”
 
 State v. Allen,
 
 94-1895, p. 7 (La.App. 4 Cir. 9/15/95) 661 So.2d 1078, 1084. “The trier of fact determines the weight to be given the evidence presented.” It is not the function of an appellate | ¶ 1 court to assess credibility or reweigh the evidence.
 
 State v. Helou,
 
 2002-2302, p. 5 (La.10/23/03), 857 So.2d 1024, 1027;
 
 State v. Rosiere,
 
 488 So.2d 965 (La.1986).
 

 A fact finder’s discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law.
 
 Jackson,
 
 443 U.S. at 319, 99 S.Ct. at 2789, 61 L.Ed.2d 560 (1979). Where rational triers of fact could disagree as to the interpretation of the evidence, the rational trier’s view of all evidence most favorable to the prosecution must be adopted on review. Only irrational decisions to convict by the trier of fact will be overturned.
 
 See State v. Mussall,
 
 523 So.2d 1305, 1310 (La.1988).
 

 The defendant was convicted of theft in violation of La.R.S. 14:67, which provides:
 

 A. Theft is the misappropriation or taking of anything of value which belongs to another, either without the consent of the other to the misappropriation or taking, or by means of fraudulent conduct, practices, or representations. An intent to deprive the other permanently of whatever may be the subject of the misappropriation or taking is essential.
 

 In order to support a theft conviction, the State is required to prove beyond a reasonable doubt each element of the crime: (1) that there be a misappropriation or taking, (2) that the misappropriation or taking be a thing of value, (3) that the thing belong to another, and (4) that the misappropriation or taking be with the intent to deprive the owner permanently of what is the subject of the taking. La.R.S. 14:67;
 
 State v. Pittman,
 
 368 So.2d 708, 710 (La.1979).
 

 The defendant contends the State evidence fell short of establishing his guilt in that no taking or misappropriation occurred. The defendant argues that there could be no taking because he was the legal owner of the 2005 Dodge truck at issue.
 

 112The defendant contends that the he and Mr. Stuteville were simply involved in a civil dispute over a contract for repairs. He notes that he hired a licensed Louisiana attorney to assist him in resolving the dispute and followed the procedures as outlined by statute for perfecting a mechanic’s lien in order to resolve the dispute and recover the money he contends was owed to him. He states that when Mr. Stuteville failed to contest the lien or issue payment for the repairs and storage costs incurred, he acquired legal tile to the vehicle.
 

 Although it was suggested by the Ms. Oxner that the legitimacy of the repairs to the 2005 Dodge were not disputed by Mr. Stuteville or Mr. Kutcher, this was sharply disputed by them at trial.
 

 Additionally, Tim Gooch testified that the defendant appeared at the Twi-Ro-Pa site and simply had the vehicle towed away to his yard despite being told he had no authority to do so. According to Mr. Gooch, the defendant told him that he could take whatever he wanted to take. That the vehicle was towed from the site was confirmed by Doug Michell.
 

 The case was essentially one of credibility, and the jury chose to accept the testimony of Messrs. Stuteville, Kutcher and Gooch, over the testimony and evidence offered by the defendant. A review of the
 
 *121
 
 evidence and testimony does not suggest that this decision was irrational.
 

 That the defendant was able to acquire a permit to sell the 2005 Dodge truck is of no moment. This was only made possible because the officers who originally responded to the call for service failed to properly investigate the matter and enter the truck into the NCIC data base as a stolen vehicle. As noted by Officer Duz-mal, the permit to sell acquired after the vehicle was stolen did not render the vehicle any less stolen.
 

 | ^Viewing all of the evidence in a light most favorable to the prosecution, any rational trier of fact could have found all of the essential elements of the crime of theft were satisfied beyond a reasonable doubt.
 

 CONCLUSION
 

 Based on the above and foregoing we affirm the defendant’s conviction and sentence.
 

 AFFIRMED.