JAMES F. MCKAY, III, Judge.
I , STATEMENT OF CASE
On July 15, 2010, defendant, Terry Winston, and his son, Christopher Winston, were each indicted for two counts of aggravated rape. On July 21, 2010, defendant pled not guilty at arraignment. On April 4, 2011, the State entered a nolle prosequi as to one count of aggravated rape as to each defendant, and the case proceeded to trial before a jury. On April 6, 2011, the jury found the Terry Winston guilty of the lesser included offense of forcible rape. Christopher Winston was found not guilty. On June 28, 2011, the trial court sentenced Terry Winston to thirty (80) years at hard labor.
STATEMENT OF FACT[1]
Detective Nakeisha Barnes, a New Orleans police officer assigned to the child abuse division, testified that she commenced an investigation into an allegation of aggravated rape involving the defendant when the victim, T.W., and her mother appeared at the child abuse office.[2] Detective Barnes scheduled a forensic interview with a child abuse advocate at the Audrey Hepburn Child Care |2Center. Detective Barnes observed the interview remotely. T.W. then underwent a medical interview. Subsequent to the medical interview, Detective Barnes obtained a warrant for the defendant’s arrest.
S.D., T.W.’s mother, testified that she married the defendant, T.W.’s father, in May 1994. They separated in December 1994. She related that while they were living together the defendant had both raped and beaten her. For a period of time she lived at the Covenant House with T.W. after she left the defendant.
T.W. was five months old when they separated. During the 2001-2002 school year, T.W. went to live with her paternal grandmother because S.D. was going through some undisclosed difficulties in her life. S.D. admitted being aware that it *334 was an unstable household and that the defendant would sometimes stay there. T.W. was seven years old at the time, and in first grade.
The house was located on Edna Street in New Orleans. The school she attended was next door to the house. T.W. returned to living with S.D. in April or May of 2002. By her own choice, T.W. has had no contact with her father since that time.
S.D. recounted how when T.W. was sixteen years old she revealed to her that she had been abused by her father. The two were having a serious conversation about choices she was making in her life. Initially, T.W. revealed to S.D. that she was gay, which allegedly upset S.D. S.D. admitted that she believes that a normal relationship is one that exists between a man and women and that is what she was taught. She questioned T.W. regarding how she could make the determination of what her sexual orientation was if she had never been in a sexual relationship. T.W. then revealed to her that she had experienced sexual intercourse with her father and that she never wanted to be touched by a man again. The next [3day, S.D. went to the child abuse division. She was told to return with T.W., which she did the next day.
Daniel Dooley, a forensic interviewer with the Child Advocacy Center of New Orleans, testified that he interviewed T.W. at the center. His interview was recorded. He identified a DVD of the interview which was played for the jury.
T.W. was sixteen years old at the time of trial. She testified that the defendant had never been much of a father to her. She referred to him as her sperm donor during her forensic interview.
T.W. testified that when she lived at her grandmother’s house, she experienced instances of sexual abuse at the hands of her father every couple of days. Although, she could not recall each instance of abuse, she explained that she did her best to forget the instances of sexual abuse because it was not something she wanted to think about every day. T.W. was unable to recognize her father in court.
The first instance of abuse that T.W. recalled occurred when she was in her father’s room in bed. He pulled her pants down and started touching her between her legs. She was scared and did not understand what was going on. Then he put his private part in her private part, which was painful. Afterwards, he gave her a towel, and she wiped herself between her legs. Then he got her some popcorn. She could not remember whether she bled after this incident.
The second incident that she remembered occurred in her grandmother’s den. He came in and asked her if she was hungry. She told him that she was. He went to the kitchen. When he came back, he put syrup on his private part and made her suck the syrup off. She was scared and confused when this happened.
|4The third instance that T.W. could remember occurred in her grandmother’s dining room. It was night time. She and her father were lying under a sheet under the dining room table, and he made her suck his private part. He ejaculated in her mouth. During this incident, she heard her uncle ask her father where she was. He responded that she was sleeping. She could not tell whether her uncle was in the room or in another part of the house when he spoke to her father.
T.W. recalled her conversation with her mother when she revealed her father’s sexual abuse. She was in her room crying when her mother came in. They started arguing, because she would not tell her why she was crying. She said that she *335 was thinking about what her father and brother had done to her.
T.W. denied that she was arguing with her mother about being gay. When pressed, T.W. stated that she did not remember discussing her sexuality with her mother at that time. She admitted that she and her mother had had conversations about being gay. She acknowledged that her mother did not approve of her being gay, but she denied that her sexuality was a source of difficulty between the two of them. She felt that she has a good relationship with her mother. She stated that when she misbehaves her mother disciplines her by taking away her cell phone. T.W. related that sometimes she is scared about how her mother will take things and that her mother does lose her temper sometimes.
T.W. explained that she waited so long to disclose what had happened because she was scared at the time. As time went on, she felt that it was too late for anyone to do anything about it.
Dr. Jamie Jackson testified that she is employed at Children’s Hospital for the Audrey Hepburn Care Center as a board certified pediatrician and practices child abuse pediatrics. She was admitted as an expert in that field. Dr. Jackson | ^explained that she sees children who are referred to the center under suspicion that they have suffered physical or sexual abuse.
Dr. Jackson completed an examination of T.W. Initially, she obtained a history from T.W. and then completed a physical examination. Her examination of T.W. revealed no specific finding of sexual abuse such as scarring, and T.W.’s complete physical examination was essentially normal, including her hymen. Dr. Jackson explained that this is the case with the majority of children that have been abused. Dr. Jackson cited one study where only six percent of children who had reported abuse exhibited positive findings of abuse.
Dr. Jackson spoke in depth about the phenomenon of delayed reporting of sexual abuse among children. One reason explaining the phenomenon is that children may be fearful of their abuser. She explained that this may have been the case with T.W., as she reported having been beaten by him. The incident occurred after she wet the bed, and he beat her with a belt. She described having bruises all over her back and legs as a result. T.W. stated that everyone in the household was afraid of her father and that her grandmother and brother suffered similar beatings.
The defendant testified on his own behalf. He admitted to be being a drug abuser for most of life and acknowledged that his drug habit had caused him to make a great many bad decisions during his life. He acknowledged not being the perfect father to T.W.; however, he denied ever abusing her.
Winston described his relationship with S.D. as being very violent. He also admitted being unable to remain faithful to S.D. He stated that by the time their relationship ended, S.D. despised him.
While T.W. was living at the house on Edna Street, the defendant’s girlfriend and her three children were also living at the house. He shared a |fibedroom with them, and T.W. slept with her grandmother. His son Christopher, and his nephew, V.W., also lived at the house.
Defendant admitted to five previous convictions, four of which were drug related. His most recent conviction was for simple *336 burglary.[3] He stated that he was released from prison on May 19, 2010. About a week later he was arrested for the current charges.
Winston admitted that he disciplined T.W. with a belt after she wet the bed. He explained that she knew that she was not supposed to drink water before going to bed but did so anyway.
The State called V.W. in rebuttal. He lived at the house on Edna Street at the same time as T.W. He testified that the defendant was violent and abusive, especially to Christopher and sometimes to T.W. He stated that several times he was forced to stop him from beating Christopher, and that he would step in to protect T.W. as well. He stated that Winston slapped and hit T.W. on many occasions. Once he hit her in the head with a telephone, which he described as being much more than a tap.
ERRORS PATENT
The defendant was sentenced to thirty years at hard labor for his conviction of forcible rape. La. R.S. 14:42.1 requires that at least two years of the sentence be served without benefit of probation, parole or suspension of sentence. This condition was not imposed by the trial court and thus constitutes an error patent.
However, La. R.S. 15:301.1(A) provides that where the statutory restrictions are not recited at sentencing, they are deemed contained in the sentence, whether or |7not actually imposed by the sentencing court. State v. Williams, 2000-1725, p. 10 (La.11/28/01), 800 So.2d 790, 799. Hence, the Court need take no action to correct the trial court’s failure to specify that the first two years of defendant’s sentence must be served without benefit of parole, probation or suspension of sentence. The correction is statutorily effected. See State v. Comena, 2002-1562 (La.App. 4 Cir. 3/19/03), 843 So.2d 464.
ASSIGNMENT OF ERROR NUMBER 1
Defendant contends that the evidence was insufficient to support his conviction. When reviewing the sufficiency of the evidence to support a conviction, this Court is controlled by the standard set forth by the United States Supreme Court in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), which dictates that to affirm a conviction “the appellate court must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt.” State v. Captville, 448 So.2d 676, 678 (La.1984). In the absence of internal contradiction or irreconcilable conflict with the physical evidence, one witness’s testimony, if believed by the trier of fact, is sufficient to support a factual conclusion. State v. Robinson, 2002-1869, p. 16 (La.4/14/04), 874 So.2d 66, 79; State v. Jones, 97-2591, p. 7 (La.App. 4 Cir. 9/8/99), 744 So.2d 165, 169. Under the Jackson standard, the rational credibility determinations of the trier of fact are not to be second guessed by a reviewing court. State v. Juluke, 98-341 (La.1/8/99), 725 So.2d 1291, 1293. “[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence.” State v. Smith, 600 So.2d 1319, 1324 (La.1992).
*337 IsWhen there is conflicting testimony about factual matters, the resolution of which depends upon a determination of credibility of the witness, the matter is one of the weight of the evidence, not its sufficiency. State v. Allen, 94-1895 (La.App. 4 Cir. 9/15/95) 661 So.2d 1078. The trier of fact determines the weight to be given the evidence presented. It is not the function of an appellate court to assess credibility or reweigh the evidence. State v. Helou, 2002-2802, p. 5 (La.10/23/03), 857 So.2d 1024, 1027; State v. Rosiere, 488 So.2d 965 (La.1986).
A fact finder’s discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Jackson v. Virginia, 443 U.S. 307 at 319, 99 S.Ct. 2781, at 2789, 61 L.Ed.2d 560 (1979). Where rational triers of fact could disagree as to the interpretation of the evidence, the rational trier’s view of all evidence most favorable to the prosecution must be adopted on review. Only irrational decisions to convict by the trier of fact will be overturned. See State v. Mussall, 523 So.2d 1305, 1310 (La.1988).
La. R.S. 14:41 defines rape as an act of anal or vaginal sexual intercourse with a person without that person’s consent. Slight penetration is sufficient to complete the crime, and emission is not necessary. The essential elements of forcible rape are: 1) an act of vaginal or anal intercourse; 2) without the lawful consent of the victim; 3) where the victim is prevented from resisting the act by force or threats of physical violence under circumstances in which the victim reasonably believes that resistance would not prevent the rape. La. R.S. 14:42.1.
Defendant contends that no rational trier of fact could have returned a guilty verdict in this case. Defendant contends that his conviction should be reversed because a rational jury could not have accepted T.W.’s testimony, especially since there was no physical evidence of rape to corroborate her testimony.
|flDefendant argues that T.W.’s allegation of rape arose as a result of being confronted about her sexuality by her mother. Defendant suggests that she created the story of being sexually assaulted in order to explain her homosexuality. Defendant contends that T.W. invented the story of being raped by her father because it provided a convenient plausible explanation for her mother. Defendant notes that because T.W. already disliked him deeply it would not have been difficult for T.W. to falsely accuse him. He notes that T.W. barely knew him and was even unable to identify him at trial. Furthermore, T.W. knew that her mother would readily accept the accusation given her history with the defendant.
At trial, T.W. denied the allegation that she needed an excuse to explain her homosexuality to deflect her mother’s anger and dismay regarding her lifestyle or that she invented the allegations as a convenient excuse. She was unequivocal that the rapes actually occurred. The jury’s decision not to accept the defense theory that T.W. falsely accused her father falls clearly within the realm of credibility.
Defendant contends that given the circumstances surrounding the assaults, the jury could not have reasonably found her story believable. Specifically, defendant contends that considering the living arrangements at the house, it would have been highly unlikely that he would have made T.W. engage in oral sex in the open where anyone living in the house could have walked in and observed his conduct. Defendant notes that the incident with the syrup occurred in the den where V.W. slept. Defendant contends that it is highly unlikely that no one would have walked in *338 or observed this occurring. However, from the testimony, it was not clear that anyone else was home when the incident occurred.
Furthermore, defendant contends that a rational juror would have had difficulty believing the victim’s account of the sexual assault in the dining room |inbecause the victim’s uncle was nearby talking to her father when this allegedly occurred. However, it was clear from T.W.’s testimony that her uncle may have been in another room when he spoke to the defendant. Furthermore, because it was night time, even if T.W.’s uncle was in the room, he might not have been able to detect that T.W. was under the table beneath a sheet. Finally, it is possible that the uncle was aware of the defendant’s conduct but did nothing about it.[4]
Defendant notes that both the incidents in the den and the dining room are suspicious because it would have been unlikely for the defendant to have assaulted T.W. outside of the bedroom that he shared with T.W. However, defendant testified that T.W. slept in her grandmother’s bedroom. Given that T.W. was only seven at the time, it would not have been unreasonable for the jury to accept defendant’s testimony regarding the sleeping arrangements at the house, and that the defendant was willing to engage in high risk behavior.
It is clear from a review of the record that when faced with a conflict in the testimony between T.W. and the defendant, the jury chose to believe T.W. regarding the actions of the defendant. It is the role of the fact finder to weigh the respective credibility of the witnesses, and it is not for this Court to second guess those credibility determinations beyond the sufficiency evaluations required under Jackson.
Despite the lack of any corroborating testimony, there was nothing from the record which suggests that the trier of fact’s decision to accept T.W.’s testimony was irrational. There was no internal contradiction or irreconcilable conflict with physical evidence with regard to the victim’s testimony regarding the essential |nelements of the crime. The victim’s testimony alone was more than sufficient to support the defendant’s conviction. The trier of fact heard directly from the victim. Obviously, the trier of act was in a superi- or position to observe T.W.’s demeanor and assess her credibility. Furthermore, the trier of fact was able to assess the veracity of T.W.’s account both at trial and by viewing the recording of the victim’s initial forensic interview. Viewing the evidence in the light most favorable to the prosecution, it was reasonable for the trier of fact to find that the State proved the elements of forcible rape beyond a reasonable doubt. Defendant’s assignment of error lacks merit.
ASSIGNMENT OF ERROR NUMBER 2
Defendant contends his thirty year sentence is constitutionally excessive and that in imposing sentence the trial court failed to comply with the requirements of La.C.Cr.P. art. 894.1 by providing an explanation for imposing the sentence that it did. However, defendant failed to preserve his sentencing claim for appeal. La. C.Cr.P. art. 881.1 provides that a defendant must file a motion to reconsider sentence within thirty days of sentencing in order to preserve for appeal any claim as to sentencing.[5] In addition, this Court has *339 held that the failure to file a motion to reconsider sentence or to object to the sentence at the time it is imposed precludes a defendant from raising a claim about his sentence on appeal. State v. Jenkins, 2009-1551 (La.App. 4 Cir. 6/30/10) 45 So.3d 173; State v. Stewart, 2004-2219 (La.App. 4 Cir. 6/29/05), 909 So.2d 636; State v. Rodriguez, 2000-0519 (La.App. 1124 Cir. 2/14/01), 781 So.2d 640; State v. Tyler, 98-1667 (La.App. 4 Cir. 11/24/99), 749 So.2d 767.
Here, the sentencing transcript shows no objection to Mr. Winston’s sentence. In addition, there is no indication in the record that he filed a motion to reconsider his sentence. As such, he is precluded from raising this claim on appeal.
CONCLUSION
Based on the above and foregoing we affirm the defendant’s conviction and sentence.
AFFIRMED

. Because Christopher Winston was found not guilty, only a limited discussion of the testimony relating to the allegations against him is presented.

. In accordance with La. R.S. 46:1844(W)(l)(a), initials of the victim, her mother, and her cousin are used in order to protect her identity.

. By defendant's admission, he pled guilty to possession of cocaine in 1995 and 1997. He was convicted of possession with intent to distribute cocaine in 2003. He admitted to three convictions for possession of drug paraphernalia. His conviction for simple burglary occurred in 2009.

. T.W.'s uncle was not identified by name during the trial.

. Specifically, La.C.Cr.P. art. 881.1(4)(E) provides:
Failure to make or fíle a motion to reconsider sentence or to include a specific ground upon which a motion to reconsider sentence may be based, including a claim of excessiveness, shall preclude the state or *339 the defendant from raising an objection to the sentence or from urging any ground not raised in the motion on appeal or review.